**MARYLAND CASUALTY CO. v. HOPPER.**

No. 4776.

Court of Civil Appeals of Texas. El Paso.

Dec. 13, 1950.

Rehearing Denied Dec. 27, 1950.

412

Kemp, Smith, Brown, Goggin & White, El Paso, for appellant.

J. H. Starley and Starley & Dennison, all of Pecos, for appellee.

## McGILL, Justice.

Appellee W. L. Hopper sued appellant Maryland Casualty Company on a manufacturer's and contractors' schedule liability policy of insurance issued by appellant to him. He sought to recover the amount he had paid to the owners of an oil and gas lease for the destruction of an oil storage tank due to an explosion caused by his negligence. He also sought to recover reasonable attorney's fees. Appellant denied coverage under the policy on the ground that the tank destroyed was "in the care, custody or control" of the insured, within the meaning of an exclusion clause which excluded from the risks covered property "in the care, custody or control of the insured."

The case was tried to the court without a jury on an agreed stipulation as to the facts. The court rendered judgment for appellee for $1348.01, the amount he had paid the leaseholder-owners for the tank and for $250.00 attorney's fees with the further provision that "In the event that the defendant shall perfect its appeal herein to any Appellate Court, then in that event the plaintiff, W. L. Hopper, do have and recover of defendant Maryland Casualty Company, a corporation, the sum of $500.00 as reasonable attorney's fees in lieu of the sum of $250.00 above adjudged and decreed. * * *"

Appellant has presented three points. We shall first deal with the 3rd and 2nd points, which are: (3) That the court erred in holding that the damaged property was not in the care, custody or control of plaintiff (insured); and (2) That plaintiff established that the loss sustained did not lie within the excepted risk and that it did lie within the general terms of the policy.

Appellant's agreement under "Coverage B—Property Damage Liability" was: "To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined."

One of the defined hazards was: "Division 1. Premises-Operations. (1) The ownership, maintenance or use of the designated premises, and all operations which are necessary or incidental thereto, * * *"

The exclusion on which appellant relies is: "This policy does not apply to (G) 'Under coverage B, to injury or destruction of (1) property in the care, control or custody of the insured' .* * *".

We think appellant is correct in its contention that the burden rested upon the plaintiff to show that his cause of action did not fall within the excepted risk; in other words, that the loss did fall within the restricted coverage. 24 Tex.Jur. Sec. 388, p. 1248; American Casualty & Life Co., v. Butler, Tex.Civ.App., 215 S.W.2d 392, w.r.n.r.e.

However, it is our conclusion that such burden was met by the agreed facts and that the court did not err in holding that the property damaged was not in the care, custody or control of the insured. We here reproduce the stipulation:

"It is agreed by and between the parties hereto that the facts upon which this controversy is based and upon which same shall be submitted to a Court of competent jurisdiction for determination upon the law are as follows:

"I.

"On or about the 22nd day of April, 1949, Maryland Casualty Company, acting by and through its duly authorized agent, Dean & Dean Insurance Agency of Pecos, Texas, did issue a certain manufacturers and contractors schedule liability policy to W. L. Hopper of Mentone, Texas, being Policy No. 53–11897, effective from the 22nd. of April, 1949, to the 22nd. day of April, 1950, for a valid consideration paid, and received by the company, and which policy was in full force and effect at all times in which the facts relative to the question here involved took place. That a copy of said policy is attached to this stipulation.

"II.

"On or about the 19th day of May, 1948, M. A. and J. S. Grisham and Grisham-Hunter Corporation were the owners and holders of an oil and gas leasehold estate in what is referred to as Tunstill Field, Loving County, Texas, and upon the completion of a well upon said lease some time prior to May 18, 1949, entered into a contract with W. L. Hopper as an independent contractor to go upon said leasehold estate and to lay flow lines connecting said well to a battery of two 500 barrel capacity oil storage tanks and to lay a pipe line from the gathering pipe line system near the lease to said oil storage tanks on said lease, being a distance of approximately 2500 feet.

"III.

"That said tanks had been installed upon the premises by the Mapp Tank Company of Odessa prior to said W. L. Hopper entering upon the premises; that such installation of said tanks so made by the Mapp Tank Company was for the oil and gas leasehold owners; that said Mapp Tank Company built the embankment and foundation for said tanks, permanently set said tanks thereon, and that said tanks, when set in position, had been installed with the necessary catwalks, ladders, all flanges for connection of pipe and pipe lines were threadded to receive pipe and in place on said tanks, and all that was required of the contractor connecting the tanks to the well and to the pipe line was to connect the pipes of the various lines into the threadded flanges that were already in position.

"IV.

"That in pursuance to such contract, W. L. Hopper on May 18th, commenced work and connected said well to Tank No. 1 through a separator by means of a 3″ flow line, which flow line was also connected to Tank No. 2. Thereafter, Tanks Nos. 1 and 2 were connected by an equalizer line, which is mared 'A' on the attached plat. The output line and valve were screwed into the flanges on each of the tanks. About 10:00 o'clock P. M. on May 18th Hopper advised the oil and gas leasehold producer's employees that Tank No. 1 could receive oil for the purpose of running a twenty-four hour test upon the well. At that time Tank No. 2 was not ready or in condition to receive oil.

"V.

"On May 18th, after being advised by Hopper that Tank No. 1 was ready to receive oil, the owners of the oil and gas leasehold estate had started running oil from the well to Tank No. 1 for test purposes and for the purpose of storing the oil. The output valve on Tank No. 1, that is the valve connecting said Tank No. 1 to the pipe line, had been closed before the oil run was started, but through some oversight on the part of Hopper or his employees the valve connecting Tank No. 2 had not been closed. It was Hopper's duty, as an independent contractor, to see that such valve on Tank No. 2 had been closed, and that the tank was in a safe condition for such purposes, before applying heat to the pipe line which caused the explosion hereinafter described.

"VI.

"On the following day, May 19th, Hopper returned to complete the work which he had contracted to do, at which time he connected the bleeder lines on both tanks and the vent lines on both tanks, which work was completed about 3:00 P. M.

"VII.

"On May 18th. and May 19th, Hopper, as independent contractor, had started lay-

ing, with another crew, a pipe line connection from the main gathering pipe line system in the oil field to the tank battery above described. On May 18th, Hopper, with a crew working on the tanks had commenced laying said pipe line which was referred to above as the 'output pipe line' from Tank No. 1 to Tank No. 2, and on May 19th, after the completion of other connection on the tanks, had started to lay the pipe line from the tank battery to meet the crew bringing the pipe line from the main gathering system.

## "VIII.

"At about 4:00 P. M. on May 19th, Hopper and his crew had extended the output line to a point approximately 33 feet from Tank No. 2, at which point it was necessary to bend the pipe at an angle of 45 degrees in order to meet the line being laid by the other crew from the gathering system. In order to bend the 3″ pipe, it was necessary that the pipe be heated with an acetylene torch. While heat was being applied for the purpose of bending the pipe, the explosion occurred in Tank No. 2 which destroyed it and rendered it useless for the purpose for which it was made, and beyond repair. After the explosion it was determined that the valve which controlled the output from Tank No. 2 into the pipe line had been left open and was open at the time heat was applied to the pipe line. Gas had apparently escaped from Tank No. 1 into Tank No. 2 through the equalizer line or the vent line, passed into the pipe on which Hopper was working, and was ignited as a result of the application of heat. It was determined that the flow line valve through which oil would normally pass into Tank No. 2 had not been opened so that oil could be placed in said Tank No. 2.

## "X.

"It is the custom in the oil fields that the oil and gas leasehold owner and producer will install a battery of storage tanks upon a lease to which one or more wells may be connted, that the necessary flow lines will be connected by such producer from the well to the tank battery and treatment installations as may be necessary, and the oil delivered to the storage tanks in said battery for the purpose of accumulating until the pipe line company purchasing such oil is ready to run same. The oil in said tank battery remains the property of the producer until the same passes through the output valve and then it becomes the property of the pipe line company.

## "XI.

"It is the custom in the oil field that if one crew of men is doing a certain type of work in connection with tanks or equipment, which are used for the storage or transportation of inflammable or explosive oils or gases, that no other crew will work on the said tank or the same equipment without first securing a clearance from the crew already at work. It is a custom in the oil field for a producer to wait for a go-ahead signal or clearance from the men doing the flow line work on tanks before he puts the tanks into use.

## "XII.

"It is agreed and stipulated that the photographs attached hereto, together with the plat attached hereto may be considered as part of the evidence in this stipulation. It is understood, however, that the photographs in which there is shown to be a heating unit connected with said tank battery do not clearly portray the condition of the tanks at the time of the explosion, in that said heating unit, which is an integral part of a tank battery, in this locality, was added by the oil operator sometime subsequent.

## "XIII.

"It is further agreed that M. A. and J. S. Grisham made demand upon W. L. Hopper for the payment of the damage in the amount of $1,348.01, that W. L. Hopper gave Maryland Casualty Company due notice thereof, and that Maryland Casualty Company denied liability under the policy above referred to.

"Starley & Dennison,
By: J. H. Starley,
Attorneys for Plaintiff.
Kemp, Smith, Brown, Goggin & White,
By: Wyndham K. White,
Attorneys for Defendant."

no-17

Note = A indicates 3" equalizing line between tanks.

d        "        Valves

Considering the policy in question in its entirety there can be no question but that its purpose was to protect appellee Hopper in his business of oil well servicing against accidental loss for which he might become liable because of injury to or destruction of property of others. One of the hazards insured was by the definition of hazards above quoted the use of designated premises and all operations which were necessary or incidental thereto. There is no specific designation of the premises covered, their location being described merely as "Mentone and elsewhere in the State of Texas", therefore if the description of hazards above quoted is to be given any effect we think it must necessarily cover any property used by appellee in his business of oil well servicing or necessary or incidental thereto. Such in our opinion under the agreed facts was Tank No. 2. It was not in the care, custody or control of appellee, but was merely necessary or incidental to his work of laying and connecting the tanks with the well and with the gathering pipe line. The tanks had been installed by the Mapp Tank Company and were supported by a foundation and an embankment. We understand they were so firmly attached to the realty as to become a part of it. Certainly it could not have been contemplated by the owners of the leasehold estate that such real estate should be placed in the care, custody or control of appellee during his operations. He was merely permitted to use the tanks as well as the surface of the leased property for the purpose of accomplishing the work he was employed to do. See A. T. Morris & Co. v. Lumber Mutual Cas. Ins. Co. of New York, 163 Misc. 715, 298 N.Y.S. 227.

In the words of the policy the tanks were "designated premises whose use was necessary to appellee's operations." Appellee paid for protection against damages imposed upon him by law because of accidental loss of such property. We therefore overrule appellant's second and third points.

Appellant's first point is that the court erred in allowing plaintiff (appellee) recovery of attorney's fees against defendant (appellant). We sustain this point. Appellee relies on Art. 4736, V.A.C.S. as authorizing attorney's fees under the policy sued on. In our opinion appellant is correct in its contention that the policy sued on is neither a life insurance policy or an accident insurance policy, or life and accident, health and accident, or life, health and accident insurance policy comprehended by the Statute, and therefore in the absence of a statute attorney's fees are not recoverable. 24 Tex.Jur. p. 1148. The policy is clearly an indemnity policy covering the insured's liability to third parties. Such policies are not included in Art. 4736. Ocean Accident & Guarantee Corp. v. Northern Texas Traction Co., Tex.Civ.App., 224 S.W. 212, 213, loc.cit. 217(6, 7) Wr.Dis.

If the judgment awarding $500.00 attorneys fees only in the event defendant shall appeal to an Appellate Court were valid it would present a serious question of whether the judgment was a final judgment and as such appealable, since this portion of the judgment is contingent upon appellant's election to appeal therefrom. However, that portion of the judgment above quoted which provides that in the event the defendant shall perfect an appeal that the plaintiff do have and recover of defendant the sum of $500.00 as reasonable attorneys fees in lieu of the sum of $250.00 was and is unauthorized. It does not, however, render invalid so much of the judgment as the court had authority on the hearing of the case to render, that is, the judgment for $1348.01. The judgment in this respect is valid and final, and hence appealable. Cooksey v. Jordan, 104 Tex. 618, 143 S.W. 141. Since under the Statute attorneys fees are not recoverable, the portions of the judgment which purport to award such fees are ineffective and the judgment should be reformed so as to eliminate such portions therefrom, and as so reformed should be affirmed. It is accordingly so ordered.