The TRAVELERS INDEMNITY COMPANY, Appellant,

v.

B. N. HOLMAN, Mary Alice Coombs, et al., Appellees.

No. 21037.

United States Court of Appeals Fifth Circuit.

April 8, 1964.

Coleman Gay, Gay & Meyers, Austin, Tex., for appellant.

Brooks N. Holman, James R. Sloan, Austin, Tex., Patrick W. Thompson, Breckenridge, Tex., for appellees.

Before HUTCHESON and BROWN, Circuit Judges, and CHRISTENBERRY, District Judge.

JOHN R. BROWN, Circuit Judge.

The real question in this case is whether an insurance company has some special kind of immunity from legal liability for express commitments made by its direct employee acting strictly in accordance with his authority. We hold that no such immunity exists.

The problem takes this form largely because of judicial utterances frequently made—certainly often enough for us to say that the Texas-Erie signal comes in clear—that insurance coverage, as distinguished from forfeiture, may not be extended by implication from conduct or action which might otherwise constitute grounds for waiver or estoppel *in pais*.[1] In reaching our decision, we do not in any degree question the binding effect upon us of this principle of Texas law. Neither do we seek to undermine or modify it in the slightest degree, or otherwise succumb to the importunities of those who challenge its correctness.[2]

These problems emerge from flood damage on October 28, 1960, to property adjacent to that of Holman, the Assured, caused by slippage of dirt fill into a ravine called Shoal Creek in Austin, Texas. These property owners-Appellees filed a damage suit in the Texas State Courts. Travelers, the Insurer, then filed a declaratory judgment suit, 28 U.S.C.A. § 2201, seeking a declaration that it had no liability under its Comprehensive Personal Liability Policy either for such damages or defense of the state court suits. On a jury trial the District Court after completion of all evidence and the filing of motions for instructed verdict by each of the parties, all of whom categorically stipulated that there were no issues of fact for the jury, denied the Insurer's motion and granted that of the Assured. The Court thereby held that on the facts of this record the Insurer was liable for damages and defense.

1. It was recently stated for Texas in Great American Reserve Ins. Co. v. Mitchell, Tex.Civ.App., 1960, error ref'd, 335 S.W. 2d 707, "Plaintiff's claim and recovery run directly contrary to the settled Texas law of waiver and estoppel with respect to risks designated in an insurance policy. Waiver and estoppel may operate to avoid a forfeiture of a policy, but they have consistently been denied operative force to change, re-write and enlarge the risks covered by a policy. In other words, waiver and estoppel can not create a new and different contract with respect to risks covered by the policy. This has been the settled law of Texas since the decision in Washington Nat. Ins. Co. v. Craddock, 130 Tex. 251, 109 S.W.2d 165, 113 A.L.R. 854 * * *," 335 S.W.2d 708. See also Massachusetts Bonding and Ins. Co. v. Dallas Steam Laundry & Die Works, Tex. Civ.App., 1935, error ref'd, 85 S.W.2d 937; Powell v. American Casualty & Life Co., Tex.Civ.App., 1952, 250 S.W.2d 744, error ref'd; Snow v. Gibralter Life Ins. Co., Tex.Civ.App., 1959, error ref'd n. r. e., 326 S.W.2d 501; White v. Great American Reserve Ins. Co., Tex.Civ.App., 1961, no writ hist., 342 S.W.2d 793.

We have frequently expressed similar views for various states within this circuit. C. E. Carnes & Co. v. Employers Liability Assurance Corp., 5 Cir., 1939, 101 F.2d 739. "It is well settled that conditions going to the coverage or scope of a policy of insurance, as distinguished from those furnishing a ground for forfeiture, may not be waived by implication from conduct or action. The rule is that while an insurer may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage or restrictions on the coverage cannot be extended by the doctrine of waiver or estoppel. * * *" 101 F.2d 739 at 742.

2. The appellees point out that frequently the cases voicing this view did not involve a true estoppel situation. Additionally, they cite the following cases against the doctrine: Employers Liability Assurance Corp. v. Madric, Del., 1961, 174 A.2d 809 (quoting from 25 N.C.L.Rev. 209); Houtz v. General Bonding and Ins. Co., 10 Cir., 1956, 235 F.2d 591; American Eagle Fire Ins. Co. v. Burdin, 10 Cir., 1952, 200 F.2d 26; Traders & General Ins. Co. v. Lucas, Tex.Civ.App., 1955, error ref'd n. r. e., 281 S.W.2d 188; Camden Fire Ins. Assoc. v. Wandell, Tex.Civ. App., 1917, 195 S.W. 289.

Although the case revolves around the insurance policy, the flashback technique helps to set the stage. Mitchell v. Hooper Equipment Co., 5 Cir., 1960, 279 F.2d 893, 894.

The Assured, Holman, was a builder and subdivider. In 1958 the Assured by two separate purchases bought the tract of land involved in this occurrence. It ran approximately 1100 feet from north to south fronting on Shoal Creek Boulevard. The northern most third tapered to a sharp point and the base of this apex, the widest part of the property, was in the neighborhood of 250 feet. At the time of the occurrence, October 28, 1960, there were three completed duplexes on the tract, two of them being in the northern "apex"—one at 4016 Shoal Creek Boulevard and the other, No. 4108, at the extreme northern tip—and the third, No. 3910, at the extreme southern end. Between No. 4108 and No. 4016 there was approximately 200 feet of open land. Between No. 4016 and No. 3910 there was over 600 feet. Running down through the west side of the lower two-thirds of this tract was a ravine or gully called Shoal Creek. A good portion of the property fell off sharply at the back (west) side. For the property to be usable as city lots, considerable filling in and leveling off would be required. Fortunately for the Assured he did not have to procure and dump such fill at his expense.

Apparently outsiders considered it a convenient dumping area. The Assured welcomed this. From time to time, he had a bulldozer move or spread dump-fill both to level off the land and to provide more convenient access to dump trucks bringing in the free material.

About the time of the October 28, 1960, flooding incident, Austin had experienced heavy rains. Apparently the surface water caused some of the loose fill to slip down into Shoal Creek damming it up resulting in an overflow onto property of the State Court damage claimants located west of Shoal Creek. The fill which slipped had been on the unoccupied open land approximately 600 feet in length lying between No. 4016 and No. 3910 at the south.

The likelihood that some kind of damage might result from these gratuitous land filling activities had been of immediate and express concern to the Assured. Unlike some who might fret or worry about such contingencies, this Assured sought to do something about it. He was, first, insurance-minded. For its solution, he turned to his Travelers agent. In words which would do credit to the most exuberant Madison Avenue copywriter for its nationwide umbrella advertising campaign, the Assured described their long relationship of mutual confidence and dependence, both for insurance and for mortgage loans.[3]

3. When asked how long he had purchased his insurance coverage requirements from this Travelers' agent and relied on him for coverage, he stated:

"There had been a relationship with the agency over a period of years and over a number of houses * * *. [I knew that] the agency represented or sold loans * * * to the Travelers Insurance Company.

" * * *

"We had processed many loans together for the Travelers Insurance Company. I knew he worked for the McCallum agency, and he took care of most of my insurance. For instance, when I had a hay barn in Matagorda County that I thought might burn down, I called him and I told him I'm vulnerable there. He said,

'You're insured.' When my daughter got a diamond ring as a gift from her grandfather, I told him that [she] needed coverage; he says 'You're insured.' That had gone on when * * * [we] moved new people in the house or we needed insurance on a house, and I told him the need, and he said, 'You're covered.' That was the relationship that existed through a number of years. And I had every reliance on Mr. Frank Knight as my agent. He operated with the McCallum agency, and at times when Mr. Knight wasn't available or there was a claim to work out, why, Mr. McCallum personally took care of us, as he did on the occasion when I needed a rider on the policy at 4016 Shoal Creek Boulevard."

In consultation with his Travelers agent, the Assured had earlier procured in July 1959 a Comprehensive Personal Liability Policy with limits of $50,000.[4] Subject only to the monetary ceiling, it is comprehensive in the sense that it literally comprehends all claims without limitation as to causes.[5] But other provisions make it plain that much less is bargained for. This comes about from restrictions, definitions, and exclusions. At the outset, as the name implies, it is insurance against *personal* liability: These liabilities could arise from actions of individuals or from the use of property, or both. This in turn calls for definition of the class of persons whose conduct is insured,[6] and here more important, the nature of the properties covered. Business property, as such, is excluded from the definition of the insured "premises," but the definition includes much more than the family residence and of great importance here it specifically includes vacant land.[7] This "personal" as distinguished from "business" liability coverage is emphasized even more directly in the formal exclusion which provides that the policy "does not apply * * * to any business pursuits" of the Assured.[8]

This policy as originally issued named the Assured and specified the street address of his residence. When the duplex at No. 4016 was completed, or nearing completion,[9] the Assured, following his

4. This policy was on the standard form described in detail in Comprehensive Personal Liability Policy, 23 Ins.Counsel J. 57 (1956).

5. Under Insuring Agreement Paragraph I Coverage A—liability, the Insurer agreed to:
"To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and as damages because of injury to or destruction of property, including the loss or use thereof."
Under § II, Defense, Settlement, Supplementary Payment, the Insurer, with respect to "such insurance as is afforded by this policy," agreed to:
"(a) defend any suit against the Insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent * * *."

6. Under § III the term "insured" included broadly the named insured and the members of his household and certain employees.

7. § IV. "Premises, business, residence, employee and automobile defined.
"(a) Premises. The unqualified word 'premises' means (1) all premises where the named insured or his spouse maintains a residence * * * *except business property* and farms, (2) individual or family cemetery plots or burial vaults, (3) premises in which an insured is temporarily residing, if not owned by an insured and (4) *vacant land*, other than farm land, owned by or rented to an assured. Land shall not be deemed vacant following the commencement of any construction operation thereon unless such operations are being performed solely by independent contractors in connection with the construction of a one or two family dwelling for the insured.
" 'Business property' includes (1) property on which a business is conducted, and (2) *property rented* in whole or in part to others, or held for such rental, *by the insured*. The insured's property shall not constitute 'business property' because of (a) occasional rental of the insured's residence; (b) rental in whole or in part to others of a one or two family dwelling usually occupied in part by the insured as a residence * * *; (c) rental of space in the insured's residence for office, school or studio occupancy * * *.
"(b) Business. 'Business' includes trade, profession or occupation." (emphasis added).

8. Under the heading of "Exclusions" the policy states:
"This policy does not apply:
"(a) (1) to any business pursuits of an insured, other than activities therein which are ordinarily incident to non-business pursuits, (2) to the rendering of any professional service or the omission thereof, or (3) to any act or omission in connection with premises, other than as defined, which are owned, rented, or controlled by an insured, * * *."

9. Only the foundation slab of No. 3910 existed at this time.

practice of insuring his exposures, consulted his agent. The Assured accepted the Travelers agent's suggestion that the policy be amended by an endorsement effective November 16, 1959. No question has ever been presented about the authority of the agent to issue the endorsement or its binding effect. This is highly significant, however, because the issuance of this amending endorsement completely distorted and changed the character of this insurance. On its face, it was no longer one insuring against "personal" non-business liabilities. This is so because the endorsement amended the policy by adding "the following location" which it then classified as property to be rented to others.[10] Rental property is expressly included in the definition of "business property" (see § IV(a), note 7, supra). In effect the endorsement was providing coverage for liabilities impliedly not insured under the definition of premises "except business properties" (see note 7, supra) and expressly excluded under "business pursuits" (see note 8, supra). Divining the underwriter's intent from these contradictory agglutinations is, of course, no easy matter. If errors occur, Judges perhaps may indulge a little comfort from the fact that, not really of their own making, they come from what loosely may be called loose draftsmanship. See Nardelli v. Stuyvesant Ins. Co., 5 Cir., 1959, 269 F.2d 592, 1958 AMC 2404; Schmutz v. Employees' Fire Ins. Co., 2 Cir., 1935, 76 F.2d 119, 122, 1935 AMC 1067, 1072; Ocean Accident & Guarantee Corp. v. Aconomy Erectors, 7 Cir., 1955, 224 F.2d 242, 247; Ins. Counsel J. 572, 582 (October 1961).

At the time No. 4016 was added by endorsement, no concern was given to the land filling activity. A few days later, about December 16, 1959, the Assured became apprehensive of likely injuries to members of the public who might be on this land. Following his long time practice, he again turned to his Travelers agent. As can readily be seen from examination of these obscure policy provisions, notes 5, 7 and 8, and the contradictory endorsement (note 10), whether the Assured had coverage against these exposures was far from certain. Was this vacant land? Did the vacant land have to be attributable to No. 4016? Was the land-filling gratuitously by members of the public, but to the benefit of the Assured in his eventual plans to develop the property a "business pursuit"? Was filling the land an activity "ordinarily incident to non-business pursuits"? Did these activities and the Assured's purpose to develop the property make all or any part of it "premises other than as defined" within the vague exclusion of (a) (3), see note 8, supra? The Travelers Agent did not undertake to answer these vexing questions. He understood that the Assured wanted coverage, and that if he did not have coverage, he wished to procure it. Faced with this practical problem and fulfilling the mission of a responsible insurance agent, he sought direct and positive information from the underwriting department of the Insurer. By formal, written official memoranda giving full information on the filling-leveling activities and Holman's intention to ultimately build houses, the underwriter was asked the specific question: "Is Mr. Holman properly covered under the Comprehensive Personal Liability policy or should he have an OL&T [Owners, Landlord and Tenant] policy on this duplex and include with it the vacant

---

10. An additional premium was charged for the endorsement stating the policy is "amended in the following particulars:
"TO ADD THE FOLLOWING LOCATION:
"4016 SHOALCREEK BLVD.
"AUSTIN, TEXAS
"CLASSIFICATION:

"TWO family dwelling premises rented to others (with or without incidental office, professional, private school or studio occupancy)—no part occupied by the insured.
" * * * If any additional premium is noted above, this endorsement is issued in consideration thereof."

property surrounding it?"[11] To this the underwriter—acting with unchallenged authority for the Insurer—gave positive assurances that coverage now existed and that an OL&T policy was not needed.[12] As Travelers agent and Travelers underwriter expected, the Assured, relying on this commitment, did not procure other insurance.

And then the rains came. With the rains came the damming and overflow of Shoal Creek. The flood waters receded leaving damage to neighboring property and this grist for our mill. For now the Assured was to learn that, despite his prudent planning, the extraordinary precautions on the part of Travelers agent, and the express commitment of a company-employed underwriter, he had no insurance because the policy said to be sufficient did not afford coverage. The Insurer denied coverage on two grounds. The first was that this was a "business pursuit," not a "personal" activity. Second, assuming a personal, non-business pursuit, this was not "vacant land," hence there were no insured premises on which to predicate coverage.[13]

11. "THE TRAVELERS INTEROFFICE MEMORANDUM

"TO R. C. Wallace, Underwriter—San Antonio

"FROM A. N. McCallum, Jr.

"SUBJECT Berkely N. Holman
          CP 7825251                                                      12/16/59

   "The above policy covers Mr. Holman's residence and to it has been added a two family dwelling at 4016 Shoal Creek Blvd. This duplex is located in the middle of a piece of property that is three blocks long on Shoal Creek Blvd. Most of this property is at present time undesirable for building purposes but Mr. Holman is permitting people to dump dirt and fill soil on this property and at times he levels it off with a bull dozer to make it more convenient for the people who are hauling the fill dirt. This dirt is not bought by Mr. Holman but it is dumped on this property at no cost to him. As these lots become filled up they will be desirable for building purposes and Mr. Holman will either sell them or build houses on them.

   "My question is, is Mr. Holman properly covered under the Comprehensive Personal Liability policy or should he have an OL&T policy on this duplex and include with it the vacant property surrounding it?"

———◆———

12. THE TRAVELERS INTEROFFICE MEMORANDUM

"TO Chiles, McCallum & Nagle, Austin
       Attn: Artie McCallum

"FROM Field Underwriter Wallace, San Antonio

"SUBJECT  Berkely N. Holman                               December 21, 1959
           CP 7825251
           Period 7-25-59 to 62

"Dear Artie:

   "In reply to your memo of 12-16-59, as the premises now stand at the location at 4016 Shoal Creek Blvd., there would be coverage under this policy to the insured for the vacant property that is being filled in by other parties on a gratuitous basis.

   "We do not believe in view of this that an OL&T policy would be necessary as sole coverage is presently provided.

   "We believe this is the information you desire and if we can assist further, please advise."

———◆———

13. This is an affirmative statement of the exclusions negatively stated in the definition, see note 7, supra, and also in exclusion (a) (3), see note 8, supra. This provides the policy does not apply "(3) to any act or omission in connection with premises, other than as defined, which are owned, rented or controlled by an assured * * *."

No difficulty is presented as to the "vacant land" aspect. In its approach the Insurer insists that the vacant land must be attributed to some premises. On that basis it argues that this land is no more attributable to No. 4016 than it was to No. 3910 to the south or No. 4108 to the north. But the policy does not here tie vacant land either to the Assured's residence or to the business property duplex added by endorsement. Vacant land is in no way limited save that it must not be a farm. The policy covers all vacant land wherever owned, wherever located. Nor does the policy definition taking away vacant land status "following the commencement of any construction operations * * *," see note 7, supra, alter the situation. True, at the time of the flood, there were then three completed duplexes, but these were not located on the unoccupied, open "vacant" land. These were on well defined traditional city lots which either were then, or were shortly to be, formally platted on approved subdivision plans. There is absolutely no evidence to indicate that this wide space between No. 4016 and No. 3910 was in any way referable to either one of these two duplexes or duplex sites. It was then unused, unoccupied, and available for similar residential structures, a number of which were actually built between the date of the loss and the date of the trial. The District Court was equally correct in holding that this gratuitous filling operation was not itself the commencement of construction. We can assume that filling and grading could be the commencement of such operations, but this would depend on actual proof, and this was lacking here.

As to the business pursuit defense, we think it inappropriate to discuss the meaning and interpretation of this rather unusual term, especially in the light of policy provisions which are something less than self-illuminating. It is our conclusion that these matters are really academic. Whatever the proper interpretation of these terms standing alone might be, we hold that the inquiry to, and the commitment of, the Insurer's underwriter was enough to subject the Insurer to liability.

Although we rest liability on the commitment made by the company underwriter and not on action of the local Travelers agent, it is uncontradicted that the agent had full knowledge of all of the Assured's activities, including those being conducted on this Shoal Creek Boulevard property. This knowledge existed when the policy was first issued. It existed when the policy was contradictorily amended by the endorsement in early December. And most certainly it existed at the time the specific inquiry was submitted to the underwriter. Under controlling Texas law, the Insurer was charged with all of the agent's knowledge. Camden Fire Ins. Assoc. v. Sutherland, Tex.Com.App., 1926, 284 S.W. 927; Legal Security Life Ins. Co. v. Erwin, Tex.Civ.App., 1963, no writ hist., 372 S.W.2d 750; 32 Tex.Jur.2d, Insurance § 145, at 249 (1962).

To circumvent the Texas rule against extension of coverage by estoppel *in pais*, see note 1, supra, three theories are available, two of which are argued most strenuously by the parties. The first is that the underwriter's commitment [14] constituted a practical construction of the contract by the parties. In the Texas view there " * * * is no stronger rule for construing a contract of doubtful meaning than that which gives effect to the parties' own interpretation. Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504; James Stewart & Co. v. Law, 149 Tex. 392, 233 S.W. 2d 558, 22 A.L.R.2d 639." United Founders Life Ins. Co. v. Carey, 1963, Tex., 363 S.W.2d 236, 243. This is a logical extension to a post-contract point of time of the familiar principle that in contract interpretation, the Court must put itself in the position of the parties.[15] We need not dwell on this theory because the sec-

---

14. For convenience this term comprehends the agent's submission and the underwriter's answer, notes 11 and 12, supra.

15. See Fidelity-Phoenix Fire Ins. Co. v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658; Indemnity Ins. Co. of

ond is more plausible and the third completely sufficient.

The second theory is that the underwriter's commitment was a classification of risks and status under the policy. As such, this does not amount to an interpretation of the contract, and certainly not to an extension of coverage. There is no question of coverage unless it was withdrawn by one or more of the express or implied exclusions. The policy, for example, undoubtedly covered liabilities arising out of "vacant land." A question then existed whether this was vacant land. The "vacant land" coverage would not be available, of course, if operations thereon constituted "the commencement of any construction operations thereon" (see note 7, supra). So, a question was present whether land filling activities or the building of the duplexes constituted commencement of construction. And regardless of the answer to these questions, there was the underlying problem of whether the Assured's activities on this property constituted a "business pursuit."

██ These were real and pressing questions as to which the answer was not necessarily clear. The underwriter's commitment was not, therefore, an interpretation of the policy, and certainly not an extension of coverage. What, and all, it amounted to under this second theory was an authoritative classification of status and physical operations. The Courts have long held insurers to classifications of risks, status, function, or activities which underlie or affect the admitted coverage of the policy. Pacific Mut. Life Ins. Co. v. Snowden, 8 Cir., 1893, 58 F. 342; [16] MFA Mutual Ins. Co. v. Jackson, 8 Cir., 1959, 271 F.2d 180; [17] and see, Camden Fire Ins. Assoc. v. Sutherland, Tex.Com.App., 1926, 284 S.W. 927; Legal Security Life Ins. Co. v. Erwin, Tex.Civ.App., 1963, no writ hist., 372 S.W.2d 750.

The third theory eliminates any lingering doubt. In a nutshell, it is that the underwriter's commitment was a supplemental contract based on promissory estoppel,[18] a contractual concept, not a mere instance of estoppel *in pais*.

██ The submission to the underwriter was *not simply a request for policy interpretation of status classification as such*. Though it comprehended these,

---

North Amer. v. Du Pont, 5 Cir., 1961, 292 F.2d 569; U. S. Industries, Inc. v. Camco, Inc., 5 Cir., 1960, 277 F.2d 292; Texas Eastern Transmission Corp. v. Federal Power Commission, 5 Cir., 1962, 306 F.2d 345; Spence & Howe Construction Co. v. Gulf Oil Corp., 1963, Tex., 365 S. W.2d 631, 632, 637.

16. The writing insurance agent having all facts concerning the assured's occupation classified him as "cattle dealer or broker, not tender or drover." After a loss, the insurer attempted to defend on the basis that the assured should have been classified "cattle shipper and tender" and "extra hazardous," the Court rejecting this defense stated: "When the plaintiff applied for insurance, he could do no more than state fully and truthfully what his occupation was * * * and leave it to the agent to classify the risk, and fix the rate of premium. * * * Upon these facts, the description of the plaintiffs' occupation made by the agent, and the classification of the risk thereunder, and the assurance given the plaintiff that his policy covered injuries received while accompanying his cattle to market, bind the

* * * [insurer] as effectually as if * * * written into the policy." 58 F. 342 at 345.

17. In the suit under a fire insurance policy, the insurer defended on the ground that the occupancy of the building had been changed without notice and assent from "poultry house" to a "pallet factory", thereby increasing the risk. The writing agent knew of the impending change of occupancy before renewal of the policy and advised the assured that the change would not increase the risk. The Court rejected the defense holding the agent had authority to determine that the change in occupancy did not increase the risk.

18. Though roundly approving the concept and operative principle, Corbin criticizes this label because estoppel is so often "applied to cases of misrepresentation of facts and not to promises." Consequently, "* * * the American Law Institute was well advised in not adopting this phrase and in stating its rule in terms of action or forbearance in reliance on the promise." 1A Corbin, Contracts § 204, at 232–35 (1963).

it was more directly a statement that if the existing policy did not cover, then additional insurance in the form of an OL&T policy would be obtained. In other words, the Assured was stating through Travelers agent that he desired coverage against the indicated risks. For all practical purposes, the underwriter's commitment was therefore the same as a binder for insurance against these exposures. Save for regulatory purposes, not in any way here involved, Texas law does not require any particular form, and it recognizes the validity of a binder, a contract to insure, or a contract of insurance regardless of its informality. 32 Tex.Jur. 2d, Insurance § 5, at 29, § 11, at 36, § 12, at 37, §§ 46, 47, at 90–91 (1962). Had the transaction expressly been one in which the Assured described the activities and then asked the underwriter to insure the risk, the Insurer would clearly have been liable had the underwriter stated "You are covered." The only distinction between that situation and the record in this case is the apparent lack of consideration for the promise to insure.

It is here that promissory estoppel fills the gap. The Restatement phrases it this way. "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement, Contracts § 90 (1932). Corbin discusses this under the topic "informal contracts without mutual assent or consideration" and "reliance on a promise as ground for enforcement." [19] In § 194 after quoting § 90 of the Restatement, Corbin concludes " * * * that the court decisions compel the inclusion of some such rule as that adopted by the Institute, and that the generally pre-

vailing law never was inconsistent with it." [20] Of course, as the author suggests, there are limitations to this doctrine, an important one being that the action or forbearance of the promisee must amount to a substantial change of position. Likewise, "the action or forbearance [by the promisee] must either have been actually foreseen by the promisor or must be of such a kind as a reasonable person in his position would have foreseen when making the promise." 1A Corbin § 200, at 218.

It is not for us to decide whether § 90 is good or bad for Texas. Texas has done that for us, and we are Erie-bound. The first-writing Court, Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267, 269, has categorically approved this section in Hicks v. Smith, 1959, Tex.Civ.App., error ref'd n. r. e., 330 S.W.2d 641, at 646. Accepting the principle, as we must, there is likewise no doubt that the uncontradicted facts of this record fulfill all of the ingredients of the doctrine. Without a doubt there was an implied promise that "for the vacant property that is being filled in by other parties on a gratuitous basis" there is "coverage under this policy," and because of this "an OL&T policy would [not] be necessary since "coverage is presently provided." This promise was made by one having authority and acting strictly in line of authority. Without a doubt the Insurer knew the promise would induce reliance. Travelers knew better than anyone else that there would be reliance. Both the Travelers agent and the Assured testified categorically that they relied upon this commitment and had the underwriter's statement been different, adequate insurance would have been procured. The reliance was of a definite and substantial nature. And since the Insurer never repudiated what its authorized agent had articulately done until the flood damage

---

19. 1A Corbin, Contracts, topic C, ch. 8, §§ 193–209, at 187 (1963) [hereinafter cited Corbin].

20. "The rule adopted by the American Law Institute, § 90 of its Restatement, has al-

ready received approval in the courts. It is not too much to say that it has been welcomed as filling a need and as a doctrine that was already implicit in the decisions." 1A Corbin § 206, at 250.

had occurred, and it was too late to take corrective action, the facts exactly fit the mold of § 90 which makes the promise binding "if injustice can be avoided only by enforcement of the promise."

■ That leaves only two small things. The first is the alternative contention that assuming the underwriter's commitment is otherwise legally significant, it is insufficient here because the representation to the underwriter was not complete, and in any event the conditions had changed markedly between December 21, 1959, and the time of the flood, ten months later. We think the presentation by Travelers agent, note 11, supra, was remarkably accurate and detailed. It gave the critical information about the Comprehensive Personal Liability Policy, the identification of the Assured's residence, its expansion and substantial modification by the endorsement adding business property, the activity of the public and the Assured in the filling operations, and the prospect that as the lots become filled up, the Assured would "either sell them or build houses on them." As to subsequent changes, the only ones of consequence are that the two additional duplexes had been completed. The wide open vacant land was still there. The fill was still on it, and far from being something new, these facts merely proved the accuracy of the earlier presentation that the Assured would, as he did, "build houses on them."

■ The other tag end complains of the allowance of attorney's fees in the sum of $1,000 for defense of the instant declaratory judgment action. We think the Insurer's position is correct, and the judgment must be modified accordingly. The record shows a division between attorney's fees for defense of the declaratory judgment action ($1,000) and that allowed ($1,200) for services rendered up to that date in connection with the state court suit and damage claims. As to the latter, this was clearly correct and the Court was not compelled to wait until the final gong had rung in the state court damage litigation. What the court in effect ruled is that the Insurer should long since have undertaken the defense, but since it had not, the Assured had been forced to expend these sums. That the Assured might be entitled to subsequent allowances did not make this award inappropriate.

■ However, we find no basis in Texas law for the allowance of attorney's fees at this stage for the defense of the Insurer's declaratory judgment action. When properly analyzed, we do not think Security Insurance Company of New Haven v. White, 10 Cir., 1956, 236 F.2d 215, 220; Freed v. Travelers, * * *, 7 Cir., 1962, 300 F.2d 395, are to the contrary. As we read them, there was an allowance of a lump sum attorney's fees without distinction as to the defense of the damage claims and the defense of the declaratory judgment action. Absent a statute, the Texas rule is that attorney's fees are not recoverable,[21] and clearly the statute closest in point does not apply to this type of insurance.[22]

The case ends as, for all practical purposes, it began. The Travelers agent wrote: "My question is, is Mr. Holman properly covered under the Comprehensive Personal Liability policy or should he have an OL&T policy on this duplex and include with it the vacant property surrounding it?" The underwriter likewise speaking for Travelers answered: "Coverage exists." We agree.

Modified, but as modified, affirmed.

21. E. g., Maryland Casualty Co. v. Hopper, Tex.Civ.App., 1950, 237 S.W.2d 411; cf. 32 Tex.Jur.2d Insurance §§ 416, 424–27, 438.

22. Vernon's Tex.Civ.Stat.Ann., Ins.Code, art. 3.62; Ocean Accident & Guarantee Corp. v. Northern Texas Traction Co., Tex.Civ.App., 1920, error dism'd, 224 S.W. 212, 217; Maryland Casualty Co. v. Hopper, supra, note 21.