The HOME INDEMNITY COMPANY,
Appellant,

v.

Alfred J. FULLER et ux., Appellees.

No. 11591.

Court of Civil Appeals of Texas.

Austin.

April 3, 1968.

Rehearing Denied April 24, 1968.

———◇———

Huson & Clark, Kenneth L. Clark, Robert B. Summers, San Antonio, for appellant.

Maloney, Black & Hearne, Douglass D. Hearne, Russell P. Roberson, Austin, for appellees.

HUGHES, Justice.

Alfred J. Fuller and wife, Arlene Fuller, having obtained a final judgment against J. M. Childers and J. M. Childers, Jr., an employee of J. M. Childers, for damages for the negligent loss of their motor boat sued The Home Indemnity Company, an insurance company, for recovery of the amount of such judgment on an insurance policy issued by it to J. M. Childers, dba Charlie's Lakeside Camp wherein it agreed to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage.

Home Indemnity impleaded the senior and junior Childers and while denying any liability asked, in the alternative, that if judgment were rendered against it that it have indemnity or contribution from J. M. Childers, Jr., under the subrogation provisions of the policy issued to J. M. Childers, Sr.

Home Indemnity denied liability on the ground that, under the facts, liability was excluded under provisions of the policy that it did not apply to " * * * property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control. * * * "

Trial to a jury resulted in verdict and judgment for appellees. The jury found (1) that the Fuller boat was not under the care, custody and control of J. M. Childers, or his employees, at the time of the explosion and (2) that J. M. Childers and his employees were not exercising physical control over the Fuller boat at the time of the explosion.

Appellant's first seven points,[1] very prolix, are briefed jointly. They are, in effect, that it was entitled to an instructed verdict and that there was no evidence to support the findings of the jury and that such findings were against the overwhelming weight of the evidence. We will summarize all the relevant testimony in disposing of these points.

The insurance policy in suit contained the provisions set out above.

J. M. Childers, Sr., operated Charlie's Lakeside Camp near Austin where he was engaged in the business of repairing and servicing boats and in other enterprises. J. M. Childers, Jr., was his employee and was engaged in the scope of his employment during the incidents now to be described.

Approximately two weeks prior to August 21, 1965, Alfred J. Fuller delivered the boat in question to J. M. (Buck) Childers, Jr., at Bennett Boat Docks on Lake Austin, Travis County, Texas, in order that it might be taken to Charlie's Lakeside Camp for the purpose of undergoing certain repair and maintenance work. He was instructed not to let the motor of the boat idle down, as the boat's motor might not start again because the alternator which

[1] A portion of points one and two are related to matters discussed under points nine through eleven and reference is made to such discussion.

charges the boat's battery was not functioning properly.

The boat was delivered to J. M. Childers, Sr., dba Charlie's Lakeside Camp, for the purpose of having various repairs and services performed on the boat, to wit:

a. To have the boat's motor's alternator repaired.

b. To have the oil and oil filter changed on the boat's motor.

c. To have the boat's running lights checked.

On the morning of August 21, 1965, Alfred J. Fuller and his wife, Arlene Fuller, and her small infant son arrived at J. M. Childers, Sr.'s place of business. Thereafter, Mr. Fuller hitched the boat and trailer to his automobile which was parked in J. M. Childers, Sr.'s parking lot. After hitching the trailer and boat to his car, Alfred J. Fuller backed the trailer into Lake Austin to launch the boat. Prior to backing the trailer into the lake, Arlene Fuller's small infant son was placed in the boat and he remained there until the time of the explosion.

After the boat was placed in the lake, J. M. Childer's Sr. and J. M. Childers, Jr., floated the boat over to J. M. Childers, Sr.'s gasoline dock where J. M. Childers, Jr., and another employee of J. M. Childers, Sr. proceeded to fill the boat with gasoline, pursuant to instruction from Alfred J. Fuller.

While gasoline was being put in the boat's gasoline tank, J. M. (Buck) Childers, Jr., connected a battery charged to the boat's battery.

As soon as the boat's gasoline tanks were filled, J. M. (Buck) Childers, Jr., started the boat's motor with the battery charger connected to the boat's battery and the motor ran long enough for J. M. (Buck) Childers, Jr., to get out of the boat, disconnect the battery charger from the boat's battery, check for oil leaks, and then idle the motor down. When J. M. (Buck)

Childers, Jr., idled the boat down, the motor died, whereupon he immediately started the motor again and there was an explosion in the rear of the boat where the motor is located, resulting in a fire in the boat and total destruction of the boat and its contents. Mrs. Fuller's son, Mike, was not injured.

We quote the testimony of Mr. Buck Childers describing the events immediately prior to the explosion:

"Q   All right.   Describe, if you will, to the jury just what you did once the boat got over to the dock.

A   As soon as it got there, like I say, I secured it, and I told my little cousin; Terry, to go ahead and start filling it up.   He did this, and I was talking to Mike.

Q   Where was Mike when you were talking to him?

A   Mike was sitting behind the steering wheel.

Q   The same place as when he was first put in the boat?

A   Yes, sir.

Q   And, where were you standing, or where were you while you were talking to him?

A   I was standing on the gas dock just talking to him.

Q   On the dock?

A   Yes, sir.   While Terry was refueling the boat, I remember that the battery had been low when we got there.   So, I walked inside the gas dock, it's a little enclosed building, and I got out the battery charger, and then I walked over to the boat, and stepped into the boat, and undid the hatches to the boat and attached the battery charger.   Then, I got back out and started talking to Mike, I let the charger go ahead and charge the battery in order to get it built up a little.   By that time, Terry

had finished refueling the boat, so I went ahead, and on the controls there is a throttle advance which allows the engine from a cold start to rev at a higher rpm than it would if it's under normal start. So, I went ahead and completed setting the controls, and started the engine.

Q  Where were you when you started the engine?

A  I was sitting on the side of the boat.

*    *    *    *    *    *

A  My feet were on the side of the dock.

Q  Was Mike in the driver's seat of the boat?

A  Yes, sir, he was.

Q  What did you do?

A  The controls were sitting right beside the steering wheel, so I went ahead and set the control, the throttle advance is immediately behind the throttle, so I set the throttle and the key, and I remember, was on the right-hand side. I leaned over and touched the steering wheel, and turned the key on, and the engine started, and Mike grabbed the wheel, and he was playing like he was driving the boat. I leaned over the boat again, first I cut the battery charger off, and then I leaned over and disconnected the clamp attached to the battery. Then, I went and wrapped the cables back around the battery compartment, and I stepped back in the boat and closed the hatch, and I locked it down, and I got back out and—

Q  At this point, had the refueling been completed?

A  Yes, sir, it was completed.

Q  All right. Go ahead.

A  Then, I got back out of the boat, and walked back up front and again, sat beside Mike on the side of the boat. Then, I went ahead and grabbed the

throttle advance, by this time I felt that the engine was sufficiently warmed up to where it would keep idling, so I eased it back, but the engine sputtered and died. So, I slipped it back up, and I turned the key on again, and it started, and that's about the last thing I remember. Everything turned kind of orange around me, and it blew me off the side of the boat into a post."

During the time that the boat was being gassed up, the battery charged, a check for oil leaks was made, and the explosion occurred, Alfred J. Fuller and wife were about fifty feet from the boat. They were up in a parking lot of J. M. Childers, Sr.'s place of business unhitching their boat trailer from their car.

There is also testimony that after the oil and oil filter in a boat have been replaced, and after the alternator has been repaired, that it would be prudent for a mechanic to start the motor to determine if the alternator works properly and to check for oil leaks. As to this, however, Mr. Childers, Sr., testified:

"Q  In other words, before you and Mr. Fuller put it in the water, before it was gassed up, or anything, it would have been a normal procedure for you all to start the engine, or one of your employees to do that, to determine if there were any oil leaks, or if the oil pressure was up, or if the alternator was working properly. Would that not be correct?

A  Well, not necessarily. There was no reason to believe the alternator wouldn't work because I had taken it in and had it fixed. As for checking for oil leaks, there's no reason for an oil leak.

Q  Had you ever started the engine since you had had it on the dock, before you and Mr. Fuller and Buck put it in the water?

A  No.

Q Had there been any tests done on it at all?

A No.

Q It certainly wouldn't have been unusual, though, for this to happen, would it?

A Not when you have the time. But on a Saturday morning, like we were, it would not have been checked out.

Q Buck was certainly authorized, as your employee, to do that if he had the time to check it out and start it?

A Sure."

Appellant also introduced in evidence the following allegations from the trial petition of Mr. and Mrs. Fuller in their suit against Mr. Childers and son:

"While Plaintiff, Al Fuller was parking his automobile and boat trailer, the Defendant, Buck Childers, pulled the motor boat by hand alongside the gasoline pump and proceeded to fill the tank with gasoline. Immediately thereafter * * * the defendant, Buck Childers, got into plaintiffs' boat and attempted to start the engine. There was an instantaneous explosion in the engine compartment of the boat, and the entire boat became engulfed in flames, resulting in total and complete destruction of the boat and all of its contents."

As a judicial admission appellant also relies upon the following allegations from appellees' trial petition in this suit:

"While plaintiff, Alfred J. Fuller, was parking his automobile and boat trailer, J. M. Childers, Jr., proceeded to fill the boat's tank with gasoline. Immediately thereafter, without express or implied authority from plaintiffs, J. M. Childers, Jr., attempted to start the engine of plaintiffs' boat. There was an instantaneous explosion in the engine compartment of the boat, and the entire boat was engulfed in flames, resulting in total and complete destruction of the boat and all of its contents. At the time and place on the occasion in question on August 21, 1965, J. M. Childers and J. M. Childers, Jr., failed to use that degree of care which an ordinarily reasonable prudent person would have used under the same or similar circumstances in refueling plaintiffs' boat by refueling said boat while its engine hatches were open, permitting gasoline fumes to envelop the engine compartment of said boat, and also failed to use said care in attempting to start the engine on plaintiffs' boat without running the engine compartment blower to exhaust any fumes therein prior to starting the engine, causing property damage and loss of property of plaintiffs."

It is to be noted that Mr. Fuller testified on the trial of this case that the act of Mr. Childers, Jr., in starting the motor was not against his will but was with his implied consent. As to starting the boat Mr. Fuller testified:

"Q But you would not have objected to him starting the boat?

A No, sir.

Q Or maneuvering the boat in better for him to fill the boat?

A Well, as far as—like I said, it was tied up. They would have had to untie it and as far as them having to maneuver it around there, I do not see where they would have had to do that.

Q You would not have objected to that, if they had deemed it necessary?

A No, sir, but I would have objected if they had taken full control of the boat and taken it down the lake."

We also quote the following testimony of Mr. Childers, Sr.:

"Q Now, Mr. Childers, when Al Fuller came out there on Saturday morning, August 21st, 1965, and picked up his boat, was there anything left to do on that boat that you considered yourself supposed to do?

A No, nothing other than the electric motor which he said he would take in and have checked.

Q Did you have any intention, Mr. Childers, of doing any further repair work on Mr. Fuller's boat after he picked it up on the morning of August 21st, 1965?

A No."

■ It is our opinion that the evidence is of sufficient probative force to support the findings of the jury and that such findings are not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust.

The identical exclusionary clause before us was before the Corpus Christi Court in Maryland Casualty Co. v. Golden Jersey Creamery, 389 S.W.2d 701, Tex.Civ.App., writ ref. n. r. e. In this case a tank truck, filled with milk, was left by the owner on a creamery unloading ramp and in his absence a creamery employee attached the hose to the tank from the vat, plugged in the electric pump and the tank collapsed, apparently because the vent was not properly adjusted. The Court held that the tank truck was not, as a matter of law, in the care, custody and control of the creamery. The Court, citing authorities, held that the words, "care, custody and control," mean "to be in charge of" or to have the right to exercise dominion over or control of the subject matter.

The dominant facts here are that the repair work for which Mr. Fuller had placed his boat in the custody of Mr. Childers had been completed. Mr. Fuller placed his stepson in the boat, attached his car to the boat and trailer and launched the boat in the water. By these acts Mr. Fuller unquestionably took charge of the boat and exercised care, custody, control and dominion over it, or, at least, the jury could have so concluded. Nothing done following these acts conclusively establish that Mr. Fuller surrendered or relinquished this control. The boat was pushed by the Childers to the dock, which may have been momentary "physical control," where the boat was secured, filled with gasoline, the battery charged, the motor started, died, and an attempt made to restart it, all by the Childers or someone acting for them. These events do not conclusively establish that Mr. Fuller gave up his right to exercise control and dominion over the boat. This would be most unlikely since his small stepson was in the boat.

■ When the explosion occurred no one was actually exercising "physical control" of the boat. It was tied to the dock. Mr. Buck Childers was exercising physical control of some parts of the motor, the starting parts, but this was not physical control of the boat. The motor was a part of the boat, but it was not the boat.

Appellant relies upon Mid-Continent Cas. Co. v. Peerless Boiler and Eng. Co., 398 P.2d 79, a 5–3 opinion by the Supreme Court of Oklahoma. This was a case in which a boiler and a burner control unit were bolted together and while the owner was attempting to light the burner an explosion occurred which damaged both the boiler and the burner and other property. The jury found that, under policy provisions the same as those before us, the owner was in control of the burner unit but not the boiler. The Supreme Court reversed as to the boiler finding and held that it, too, was in the care, custody and control of the insured owner. Recovery, however, was allowed for damages caused to other property. This case might be authority for holding here that the motor, separate from the boat, was in the care, custody and control or physically under the control of the insured Mr. Childers. This case, however, was not tried on that theory. We also note that the decision of the Oklahoma Court on the controverted issue does not appear to be in accord with the law in Texas. See Maryland Casualty Co. v. Hopper, 237 S.W.2d 411, Tex.Civ.App., El Paso, n. w. h.

Other principal cases relied upon by appellant are P and M Stone Co. v. Hartford Accident and Indemnity Company, 251 Iowa 243, 100 N.W.2d 28 (Iowa Supreme Ct.), (operating a bulldozer without owner's consent), Pompeii d/b/a Al's Welding Shop

v. Phoenix Assurance Company of New York, 7 A.D.2d 806, 181 N.Y.S.2d 152 (jacked up car) and Sanco Co. v. Employers Mutual Liability Ins. Co. of Wisconsin, 102 N.H. 253, 154 A.2d 454 (operating elevator in making repairs). We do not discuss these cases because of their dissimilarity in facts from the facts here.

■ We have carefully read the portions of the pleadings of Mr. and Mrs. Fuller in this suit and in their suit against the Childers, copied above and relied on by appellant as conclusive admissions, but we fail to find any language in them which forecloses as a matter of law the issue of whether the boat was in the care, custody or control of Mr. Childers, Sr., or as to whether he was exercising physical control over it when the explosion occurred.

Appellant's points eight through eleven are to the effect that judgment should have been rendered for it because neither the Fullers nor the Childers negated by pleadings and evidence the policy exclusions which it had specifically pleaded, as follows:

"This endorsement does not apply:

(a) (1) to any business pursuits of an insured * * * to the rendering of any professional service * * *;

(k) under coverage N, to loss (1) arising out of the * * * maintenance, operation * * * of any * * * watercraft. * * *"

This exclusion appears in a Comprehensive Personal Liability Endorsement attached to the principal policy. Mr. and Mrs. Fuller did not sue on this endorsement and do not claim that appellant is liable to them thereon.

Appellees state that appellant did not specifically plead this exclusion in its answer as required by Rule 94, Texas Rules of Civil Procedure. Appellant in its pleading against the Childers pled that under the Comprehensive Personal Liability Endorsement it was not liable because of exclusions

"a(1) and (k) of said endorsement, in that, at the time of the damage or destruction of the (Fuller) boat (the Childers) were engaged in their respective business pursuits and were rendering professional services and thereby, fall within the provisions of said exclusion." By Supplemental Answer appellant incorporated, by reference, these allegations in its current answer at the time of trial.

■■ We do not believe that this is the function of a supplemental answer. Rule 98, T.R.C.P. provides, in part, that a supplemental answer may contain "new matter not before alleged by him, (defendant) in reply to that which has been alleged by the plaintiff." The only pleading which appellees had on file when this Supplemental Answer was filed was their Original Petition and a Supplemental Petition in answer to Appellant's Original Answer. This Supplemental Petition contained no new matter. The rules do not contemplate that an answer may consist of a series of supplemental answers when there are no new adversary pleadings filed containing new matter calling for reply. See Sec. 5.03 McDonald, Texas Civil Practice.

The parties have not and we have not analyzed all the provisions of the Comprehensive General Liability Policy and the Comprehensive Personal Liability Endorsement to determine their conflict, if any. For the General Liability Policy, the premium was $147.00. Under the provisions of this Policy, we have held appellant liable. For the Personal Liability Endorsement the premium was $14.00. It would be indeed strange that this endorsement for which payment was made should have the effect of excluding liability under the General Liability policy provisions for which much more was paid.

We overrule points eight through eleven.

Having disposed of all points made by appellant and finding no error, the judgment of the trial court is affirmed.

Affirmed.