**ABILENE SAVINGS ASSOCIATION,**
**Plaintiff-Appellee,**

v.

**WESTCHESTER FIRE INSURANCE COMPANY, Defendant-Appellant,**

St. Paul Fire and Marine Insurance Company, Defendant.

**No. 71–1636.**

United States Court of Appeals, Fifth Circuit.

March 29, 1972.

C. Edward Fowler, Jr., James A. Williams, Dallas, Tex., Bernard P. Evans, Lubbock, Tex., Bailey, Williams, Weber & Allums, Dallas, Tex., for defendant-appellant.

Bob Hanna, W. L. Burke, Jr., Schulz, Hanna & Burke, Abilene, Tex., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and INGRAHAM, Circuit Judges.

TUTTLE, Circuit Judge:

This Texas diversity case involves the question whether the failure by an insured to furnish proof of loss to its insurer within the time specified by the bond contract precludes recovery on the bond. Appellee, Abilene Savings Association, as successor to Western Commercial Savings and Loan Association, brought this action against appellant, Westchester Fire Insurance Company, seeking indemnity under a savings and loan blanket bond for losses sustained by Western Commercial through the misappropriation of funds by a person covered by the bond. The district court, following a jury trial on special interrogatories, held for Abilene Savings. We reverse.

The salient facts are not disputed. Westchester Fire Insurance Company (Westchester) provided Western Commercial with blanket bond coverage from November, 1967 until April, 1968. Among other things the bond covered losses occasioned by the dishonest, fraudulent, or criminal acts of Western Commercial's employees.

During the years 1966 and 1967 an officer of Western Commercial, in five separate transactions, wrongfully misapplied funds belonging to the company. Shortly thereafter a federal examiner uncovered documentary evidence of such misapplication, and on February 28, 1968 Western Commercial sent notice to Westchester of a *possible* loss under the bond.[1]

The bond provided, via rider, that "Within 100 days after discovery of loss under said bond by the Insured . . . the Insured shall furnish to the (Insurer) affirmative proof of loss with full particulars in writing, including dates and items of loss, duly sworn to."[2]

---

1. Notice was also sent to St. Paul Fire and Marine Insurance Company which provided coverage from June, 1965, to November, 1967, and which was an original defendant to this action. However, the District Court entered summary judgment in favor of St. Paul and it is not involved in this appeal.

2. Although we do not consider it essential to the construction we place upon this bond, it is nevertheless noted that the requirement for furnishing proof of loss within 100 days was expressly made a "condition" of the bond. The language is "The Foregoing Insuring Agreements and General Agreements are Subject To the Following Conditions and Limitations" of which a sub-part entitled "Loss-Notice-Proof-Legal Proceedings" is one. The rider, specifying that proof of loss shall be furnished within 100 days, merely modifies this provision. The rider provides that

Abilene Savings, into which Western Commercial was merged in December of 1968, subsequently stipulated that it discovered the loss, as contemplated by the bond, on February 28, 1968 when notice was first sent to Westchester. Except for a letter dated February 29, 1968 indicating that the federal examiner's investigation had turned up evidence of misappropriation, neither Western Commercial nor its successor Abilene Savings communicated with Westchester again until October 24, 1969 when the vice-president of Abilene Savings informed Westchester that the dishonest employee had been indicted by a Federal Grand Jury, and listed the charges against him. On November 26, 1969 an instrument designated "Affirmative Proof of Loss" was submitted to Westchester, but was returned to Abilene Savings on the grounds that it was deficient in several respects. A fully-documented proof of loss was finally forwarded to Westchester on February 6, 1970, nearly two years after the stipulated discovery date.

Following the failure of Westchester to indemnify it, Abilene Savings commenced this action in the United States District Court for the Northern District of Texas. The jury, responding to written questions submitted by the trial court, found that proof of loss had been furnished within a reasonable time after discovery of loss and that Westchester had not been prejudiced by the delay in filing. Judgment was accordingly entered in favor of Abilene Savings and this appeal was taken.

## TEXAS LAW

■■ We start with the proposition that under Texas law, which is binding on us in this diversity litigation, blanket

bonds such as the one before us are to be construed in the same manner as insurance contracts generally. Great American Insurance Company v. Langdeau, 379 S.W.2d 62 (Tex.1964). The general rule in Texas is that furnishing timely proof of loss, where such is an express requirement of an insurance contract, is a condition precedent to recovery in the absence of waiver or estoppel. See, e. g., Members Mutual Ins. Co. v. Cutaia, Tex., 476 S.W.2d 278; United States Fidelity and Guaranty Company v. Bimco Iron and Metal Corporation, 464 S.W.2d 353 (Tex.1971); New Amsterdam Casualty Company v. Hamblen, 144 Tex. 306, 190 S.W.2d 56 (1945); Scottish Union and National Insurance Company v. Clancy, 83 Tex. 113, 18 S.W. 439 (1892); Providence Washington Insurance Company v. Whitley, 71 S.W.2d 359 (Tex.Civ.App., Galveston 1934, writ dismissed). In the instant case the bond expressly provided that within 100 days after discovery of loss, proof thereof was to be furnished to Westchester. It is clear, of course, that Abilene Savings did not file its proof of loss within the time required by its contract, for an adequate proof of loss was not submitted to Westchester until nearly two years had elapsed since discovery. Since the proof of loss requirement can be properly characterized as a condition precedent to recovery, Abilene Savings' failure to furnish such proof within 100 days invalidates its claim for indemnity, unless an exception to the general rule applies.

In Texas either waiver or estoppel will excuse non-compliance with a condition, but since Abilene Savings failed to raise either of these defenses, we need not consider them here.[3] It is argued instead that Texas courts follow a liberal

"(t)he attached bond shall be subject to all its terms, agreements, limitations, and conditions except as herein modified" which indicates that the terms of the original proof of loss provision were altered, but not its status as a condition.

3. Since waiver may be effective even after the time for performance has passed, United States F & G v. Bimco Iron and

Metal Corp., supra, there may have been a question of fact as to the existence of waiver in this case. We note that long after the 100 day limit had elapsed, Westchester continued to act as though it were nonetheless contemplating indemnification of the loss to Abilene Savings. For instance when Abilene Savings first submitted the instrument designated "Affirmative Proof of Loss" on November 26,

rule inasmuch as they are reluctant to declare a forfeiture on insurance policies for failure to make formal proof of loss where no provision for forfeiture is contained in the contract. Concededly the bond contract at issue here contained no provision for forfeiture. However, that fact alone does not in this case preclude application of the general rule that failure to comply with a condition precedent negates recovery on the bond.

■■ The policy against forfeitures has, of course, long provided a judicial perspective for viewing insurance contract disputes involving noncompliance with conditions precedent. However, the doctrine is limited and requires some affirmative action by the parties which the courts can seize upon as justification for overriding explicit contractual provisions. As the Texas Supreme Court said, "While it is a maxim that forfeitures are odious, the law is not eager to relieve against them; it takes no initiative; and in itself presents no remedy against the contract the parties have themselves made." Equitable Life Assurance Society v. Ellis, 105 Tex. 526, 147 S.W. 1152, 1156 (1912). We are of the opinion that the case before us presents a situation in which the specific terms of the contract are controlling.

We note that neither Western Commercial nor its successor Abilene Savings made an independent effort to determine how much it had lost, but instead relied on the federal government to furnish the details. Following the correspondences of February 28 and 29, 1968, the insured did not again communicate with Westchester for nearly 20 months, even though its officers knew that proof of loss had to be furnished within a specified time. No attempt was made to secure from Westchester an extension of the time within which to furnish proof. Moreover, the insured's officers understood the requisites of a formal proof of loss, which normally include an audit of company records, yet no audit was undertaken. The facts thus indicate that Abilene Savings made little or no effort to comply with the terms of its contract even though it was fully aware of the nature and purport of the proof of loss requirement. The burden was on the insured here to effect substantial compliance with its end of the deal, but in that respect it has been deficient. We do not find in the Texas case law any indication that studied inaction of this sort is sufficient to invoke the policy against forfeiture. That doctrine is applied only where equity and good conscience dictate that recovery be had and this is not such a situation.[4]

Appellee relies chiefly on Aetna Life Insurance Company v. Tipps, 98 S.W.2d 375 (Tex.Civ.App.1936, affd. 132 Tex. 213, 121 S.W.2d 324 (1938) which involved an insurance policy requiring only "due proof", not as here proof within a specified time. In affirming the Court of Appeals decision upon which appellee relied, the Texas Supreme Court recog-

---

1969, Westchester returned the instrument to Abilene Savings on the grounds that it was incomplete and required greater detail. Having complied with this request for more information, Abilene Savings was assured by Westchester that its claim was receiving "closest attention". Indeed not until this suit was brought is there any indication that Westchester intended not to indemnify Abilene Savings because of failure to furnish proof of loss within the time specified in the contract.

4. For instance courts have granted recovery despite failure of timely proof where formal proof of loss would be an idle ceremony, Continental Insurance Company of New York v. Nabors, 6 S.W.2d 151 (Tex. Civ.App. Ft. Worth 1928), where proofs were timely filed but the insurer rejected them as unsatisfactory, Sun Mutual Insurance Company v. Mattingly, 77 Tex. 162, 13 S.W. 1016 (1890), where the insured was too ill to attend to business, Love v. Northwestern National Life Insurance Company, 119 F.2d 251 (C.A.5 1941). In addition it has been held that ignorance of the existence of an insurance policy, unmixed with negligence, excuses an untimely filing. Whitehead v. National Casualty Company, 273 S.W.2d 678 (Tex. Civ.App. Ft. Worth, 1954, Error refused). None of these mitigating circumstances is present in the instant case.

nized the clear distinction between specific time requirements in an insurance contract and those which are general. It said,

> "The policy contains no requirement to furnish the company the usual notice and proof of loss within a specifed time. In fact no element of time enters into the requirement other than that 'due proof' of disability be furnished after it had existed for a period of six months 'during the continuance of this policy'. . . . How long after, or what shall be considered 'due proof' is not specified in the policy. Cases cited by the company in support of its contention that the clause in question was not complied with . . . are not in point. The requirements to be met in those cases as conditions precedent to recovery are specific. In the present case the requirement is wholly general." 121 S.W.2d 327.

Moreover, the court concluded that the due proof requirement had in fact been complied with and thus, while the Tipps case is distinguishable from the instant one, it nonetheless supports the principle which we find is controlling in this case. Cf. Connecticut General Life Insurance Company v. Kornegay, 93 S.W.2d 164 (Tex.Civ.App. Beaumont 1936, writ dismissed).

 Where the parties have bargained freely and on equal terms their contract ought not be extended by implication or enlarged by construction beyond the actual terms of the agreement entered into by the parties. Great American Insurance Company v. Langdeau, supra. They have made their own contract and it is not for the court "to vary their terms in order to protect them from the consequences of their . . . failures in nonobservance of obligations assumed." Dorroh-Kelly Mercantile Company v. Ori-

ent Insurance Company, 104 Tex. 199, 135 S.W. 1165, 1167 (1911). The obligation assumed in this instance by Western Commercial was to furnish Westchester with proof of loss within 100 days after discovery, and, absent circumstances which would require a different result, that obligation is binding.

 Notwithstanding the above appellee urges that it is entitled to recovery on the basis of Article 5546, Vernon's Tex.Civ. Statutes which provides:

> "No stipulation in a contract requiring *notice* to be given of a claim for damages as a condition precedent to the right to sue thereon shall ever be valid unless such *stipulation* is reasonable. Any such stipulation fixing the time within which such notice shall be given at a less period than ninety days shall be void. . . . " (Emphasis added.)

The statute on its face applies only to requirements for giving *notice* and thus we are faced with the threshold question as to its applicability to *proof of loss* stipulations. On this issue there would appear to be a split of Texas authority [5] which we do not here attempt to resolve. Even if we assume that the statute does apply to proof of loss provisions, the 100 days requirement in the bond here at issue is not thereby rendered automatically void. Inasmuch as the bond provision exceeds 90 days it is void only if the provision itself is unreasonable, and that is a question of fact for the jury to determine. See, e. g., Missouri, K & T Ry of Texas v. Newton, 60 Tex.Civ.App. 110, 127 S.W. 873 (1910, writ refused). That question was not before the jury in the trial below, and since appellee neither submitted a requested instruction on the issue nor objected when none was given, it must be deemed to have waived the point.[6]

---

5. Compare Texas Farm Bureau Mutual Insurance Company v. Carnes, 416 S.W.2d 863 (Tex.Civ.App. Corpus Christi 1967, writ refused) with Austin v. Aetna Casualty and Surety Company, 300 S.W. 638 (Tex.Comm.App., Judgment adopted by Texas Sup.Ct., 1927).

6. The trial court instructed the jury to ascertain whether proof of loss in this case was filed within a reasonable period of time after discovery of loss. Although the jury responded in the affirmative, that determination does not constitute a finding that the *bond provision stipulating a shorter time* was unreasonable.

For the foregoing reasons we are of the opinion that Abilene Savings cannot recover on this bond. The contract is unambiguous and the parties thereto, being on equal terms, should be held to the obligations they assumed.

The judgment is reversed and the case is remanded to the trial court with directions to enter a judgment for the defendant on its motion N.O.V.

JOHN R. BROWN, Chief Judge (dissenting):

*Erie* cases produce eerie results, as this case so well demonstrates. For despite the fact that the assured acted as any reasonable person would have under the circumstances and that the insurer suffered no prejudice from his actions, the Court here allows an insurer to escape its obligation to indemnify an undisputed loss simply because the assured did not do something which nobody suggests it could reasonably have been expected to do at an earlier time.

The place where the Court goes wrong, it seems to me, is in failing to appreciate precisely what the provision in controversy called for. It sought *proof*—detailed, affirmative, written, particularized, verified, sworn-to *proof*—that a loss had occurred under the policy, how it had occurred, when it had occurred, by whom it had been caused and how much monetary value it involved. Anything less would not—*did* not—satisfy either the insurer or the policy provision in question. What Westchester thought the policy requirement meant can be no better demonstrated than by its own rejection of Abilene Savings' letter of October 24, 1969, which undertook to be a proof of loss in which the dates, amounts and defalcating employee were set forth with as much particularity as then possible:

"Among other things, you have offered no *proof* as to the loans or of the fact of your assertion that Mr. McAden received any of the funds which were the subject of the loans. You have given no details of the discovery of the alleged infidelity, including the dates and by whom discovered. You have given no affirmative *proof* regarding the alleged relationship between Mr. McAden and any of the recipients of the loans, nor have you explained the relationship of Mr. Mc-Aden to Western Commercial Savings & Loan Association except to mention that he held a position as Chairman of the Board of Directors. No information as to his stock ownership or other details of his relationship are given. In addition, there is not offered any *proof* of the relationship between Abilene Savings Association and Western Commercial Savings & Loan Association and with respect to your assertion that Western Commercial Savings & Loan Association of Abilene was merged into Abilene Savings Association on December 31, 1968.

"In general, the 'affirmative *proof* of loss' is not the *proof* of loss contemplated by the bond in question and until it does comply, the claim cannot be given any consideration. We assume you will want to resubmit it." (Emphasis added.)

It is therefore apparent that the proof of loss provision—as interpreted by the insurer—demanded details—"full particulars * * * duly sworn to." But it is inescapable on this record that such information was not available to Abilene Savings until the time of McAden's trial (February 1970). *Immediately* thereafter Abilene Savings forwarded all the proof to the insurer.

It must be remembered here that the defalcation involved was not a run-of-the-mill, or perhaps more accurately, a run-of-the-till case of merely some teller absconding with a cash drawer full of loot. Rather it encompassed a very complex scheme whereby the Chairman of the Board of Directors (McAden) channeled funds into his personal coffers through fraudulent loans to dummy or cooperating corporations. Though examiners were early able to tell that this individual was dipping into the till, the detailed affirmative proof demanded by the insurer required complete audit of the bank and also of the two corporations through which the money was passed and a thor-

ough investigation by the Federal Home Loan Bank and the Federal Bureau of Investigation, neither of which made their reports available until McAden's trial, in February, 1970. All of the evidence so indicated.

Robert Jordan, Vice-President of Abilene Savings testified that the first time Abilene Savings had access to detailed information with which to file a detailed, sworn proof of loss was during the trial of McAden, and that without the records of the two manipulated corporations, the precise manner of the defalcation could not be proved.[1]

Bill Churchill, the supervisory analyst for the Federal Home Loan Bank who

first discovered that a criminal investigation was appropriate, testified that his report could not be divulged to Abilene Savings, but only to government investigating authorities, and that exposure of the defalcation required examination of the records of the other corporations.[2]

James Hayes, an Examiner for the Texas Savings and Loan Department who had managed Western Commercial Savings and Loans[3] throughout 1968, testified that through December 31, 1968, he never had sufficient information to compile a detailed report of the loss, setting forth full particulars required by the bonding company, *under oath*, and outlining precisely McAden's misdealings.[4]

1. Q. And why did you not attach detailed information to them? A. I have none of the information.

Q. Sir? A. I did not have any of the information.

Q. All right, when was the first time that you did have access to detailed information with which to file the final proof of loss? A. The records that came out during the trial of Mr. McAden.

* * * * *

Q. Now prior to that time—prior to on or about February 6, 1970, did you have available to you, to your knowledge, detailed information with which a proof of loss, detailed under oath, could be submitted to the bonding company? A. I did not.

* * * * *

Q. All right, and I will ask you: without the records of those two corporations, could you tell what defalcation or fraud or theft had occurred at the hands of Mr. McAden? A. At the place in the records of Western Commercial you could not have told there was any defalcation.

* * * * *

Q. During the time that you have been concerned with that particular office out there on Pioneer Street, what used to be Western Commercial Savings and Loan, have you ever come across any detailed information by which you could have filed a sworn proof of loss in detail? A. No, sir.

2. THE COURT: What do you mean by "in a case of this kind"? A. In a case where we have findings that could lead to criminal investigation, the Federal Bureau of Investigation.

THE COURT: You divulge it only to the government investigating authorities? A. That is correct.

Q. Had you been asked to divulge the details of your investigation, would you have done so? A. No.

Q. At any time during the intervening period between the time you finished the examination and the conclusion of the trial, the criminal trial against Mr. Claud McAden, had you been asked to divulge the details of your investigation, would you have done so? A. No.

* * * * *

THE COURT: How would they expose it?

A. Through comparing the records of these two corporations and their cash flow, we could coordinate better with records of the Association to see where certain loans had been made and the proceeds of the loans had been received by Sto-Gay, Incorporated.

THE COURT: Loans made by Western Commercial Savings?

A. Yes.

THE COURT: To one of the corporations?

A. Yes, sir, to Sto-Gay, for instance, and we could see where proceeds of the funds would come to Sto-Gay and how they would be dispersed, and we saw in several instances where the funds had been dispersed back to Mr. Claud McAden.

3. Western Commercial Savings and Loan and Abilene Savings Association are one and the same. Western Commercial was merged into Abilene Savings on December 31, 1968, with Abilene Savings being the surviving entity.

4. Q. All right. Now during the time that you were out there as you have told us from January, 1968, through December 31st, 1968, did you, yourself, ever have sufficient information from which you

Indeed, all the evidence points to 'one conclusion—until McAden's trial, Abilene Savings simply did not have and could not reasonably have been expected to obtain sufficient detailed information of the nature demanded by the insurance company to fulfill its obligation to provide verified proof of loss with full particulars. And the jury, guided by appropriate instructions, so found. The Trial Court had instructed them what they had to find before they could conclude that Abilene Savings had acted reasonably.

"A 'reasonable period of time' means that period in which an ordinarily prudent person, acting under the same or similar circumstances, would have filed a proof of loss. You must consider that the ordinary prudent person would use reasonable diligence, and you must examine the conduct of the directors, officers and managing agent of the Western Commercial Savings and Loan Association to determine whether or not, if an ordinarily prudent person had been in their shoes, he would have taken as much time as was taken for the filing of the proof of loss after the discovery of the loss. In arriving at. your answer to that question you should take into consideration all of the circumstances relevant thereto that have been proved to your satisfaction."

Answering Interrogatory No. 1 that proof of loss had been filed within a reasonable period of time after discovery of loss, the jury made clear their finding

that Albilene Savings could not reasonably have been expected to acquire sufficient knowledge of "full particulars" any sooner than it did, and therefore could not have earlier filed the requisitely explicit proof of loss.

At this juncture it bears emphasis that this is not—as the Court laboriously structures it—a question of the (i) validity or (ii) strict compliance with a notice clause. I accept (i) validity and as to (ii) the stringent and recent approach which leads the Texas Supreme Court, which has not only the latest but also the last word, to a self-acknowledged injustice [5] would impel me to acquiesce in a conclusion that the letter of the bond must prevail to demand the filing within 100 days of the *required* verified proof of loss. The problem is not *when* it must be filed. It is *what* must be filed.

This involves *what* the parties intended. At this point our own cases [6] clearly establish that in the quest for intent the Court must put itself in the position of the parties. This is not a rule simply to dispel ambiguities. It is a rule for all seasons.

Considering that an insurance company from sheer self-interest knows that to attract and hold business it must supply what its market customers reasonably need to protect them against identifiable risks under limits and restrictions which are mutually bearable and, on the other hand, the customers must acknowledge an operational justification for these limitations and conditions, the problem is

---

could have compiled a detailed report of this loss, setting forth full particulars in writing and sworn to, setting forth precisely what these losses were occasioned by, that they were occasioned by Mr. McAden's misdealings. A. I don't believe I could.

\* \* \* \* \*

Q. So even had an audit been performed on the records of the Association, being Western Commercial Savings and Loan, would you have expected such an audit to reveal the fraud or defalcation that subsequently came to light? A. No, sir.

5. See Members Mutual Insurance Co. v. Cutaia, Tex.1972, 476 S.W.2d 278.

6. Cf., e. g., Williams v. Travelers Ins. Co., W.D.Tex., 1963, 220 F.Supp. 411, 413:

"It seems clear, from a reading of the policy provision that it was not the intent of the contracting parties in either case to make a delay in furnishing proofs of loss a ground for forfeiture. Had either insurance company intended to so provide, it could have done so in stronger and more positive language. As a consequence, I am unwilling to hold with respect to these cases that delay in furnishing proofs of loss constituted grounds for forfeiture."

one of determining what reasonably was meant by the 100 day provision.

On this approach, surely the parties to the bond did not contemplate that at the awful expense of forfeiture of protection paid for, the assured was required to file a completely meaningless, virtually blank piece of paper "duly sworn to" within 100 days of discovery of the loss.

What—and all—the provision in question sought to accomplish was that before the insurer should be required to pay a claim or defend a lawsuit it be shown some reliable factual, detailed evidence—other than the unverified, self-serving assertions of its assured—that a bona fide loss had actually occurred within the coverage afforded and that the amount claimed was legitimate and accurate. This would enable the insurer to determine in fact just what, if anything, was owing, so that it could promptly be paid.

Contrary to the assumptions of some, an underwriter *wants*—wants, no less—to pay a loss. He knows that without paying losses he has no reason to exist,[7] and unless he willingly—yea, enthusiastically—pays a loss no one will seek his wares, and without sales there is no business, and without business there is no profit. So for the coveted Madison Avenue image, cf. Travelers Indemnity Co. v. Holman, 5 Cir., 1964, 330 F.2d 142, 145, this requirement serves to assure the assured that, as the TV commercial puts it, he is indeed in good hands and, at the same time assure the insurer that it can honor a genuine loss in amounts which, if not altogether undisputed, are at least demonstrably fair on their face.

Likewise, having prescribed *what* is demanded in writing under oath it would be completely reasonable to prescribe (within the limits of pertinent regulatory state statutes) a fixed time in which to file *what* is required. This makes certain that before the assured could pressure the insurer with threats of costly litigation, the insurer be given an opportunity to examine the claim and determine that it is neither fraudulent, inflated nor unfounded. The time limit is designed to minimize the chance of prejudice to the insurer in accomplishing this objective caused by delay of the assured.[8]

But here the Court, never examining into what insurer-assured reasonably could have intended, and proceeding under the erroneous notion that the Texas

7. The history of the insurance business—as any executive worth his salt would insist on declaring—reveals a continuous *expansion* of coverage, which is to say, extending more and more, not less, protection to assureds to meet the business and personal needs of assureds. Frequently the express extension of coverage is a sort of Toynbeean challenge-and-response to a literal, oft-time hypercritical judicial construction of phraseology which underwriter and assured thought quite understandable. Notable is the famed, but little understood, Inchmaree clause, now common in marine policies to overcome the Court decision involving the ill-famed vessel of that name. See generally, Saskatchewan Government Ins. Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385, 1957 A.M.C. 655; Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., 5 Cir., 1957, 247 F.2d 116, 1957 A.M.C. 1946. Similarly, following the S/S Morro Castle disaster, see, e. g., New York and Cuba Mail Steamship Co. v. Continental Ins. Co. of N. Y., D.C.N.Y., 1940, 1940 A.M.C. 366, and the 1936 Siro-

vich Amendments to the Shipowners Limitation of Liability Act, 46 U.S.C.A. § 181 et seq. (§ 183), underwriters realized that to meet the needs of shipowners P and I insurance could no longer exclude liability for acts which were with the privity and knowledge of shipowner. And one need not resort to the esoteric charm of Lloyds Coffee House to find examples. The typical Home Owners policy, no longer confined to destruction of a dwelling by fire, covers under the banner of "accident" an out and out slug fest between a couple of inebriated party guests.

Of course this does not mean that restrictions, conditions, etc. are to be ignored. To the contrary they must be respected as integral factors in the coverage afforded. But they are there not to *defeat* claims. They are there to afford to the insurer those safeguards which a prudent underwriter would think essential.

8. By answering Interrogatory No. 2 in the affirmative, the jury indicated that it found that the insurer was not prejudiced by the assured's filing proof of loss when it did.

question is one of *when,* not *what,* has transformed the provision into something altogether different—a requirement that the assured, on risk of forfeiture for non-compliance, either file a paper swearing to facts it could not reasonably be expected to know, or file a paper ostensibly under oath which because of its lack of particularity, could be of no benefit or value to anyone.

I do not think an insurer ought to be allowed to so easily avoid its obligations simply because the assured, acting reasonably, did not do something which was not required by the policy—file a meaningless piece of paper—or something which it could not reasonably have been expected to do—verify facts which it could not possibly have accumulated, particularly where the loss is uncontradicted both as to coverage and amount.

I am the first to acknowledge that the Court decides the case the way it does because it conscientiously feels compelled to do so by the *Erie* Texas law, but I believe that the Court has misperceived the pivotal inquiry to be one of *when,* instead of *what.*

I therefore respectfully dissent.