United States Court of Appeals,

Fifth Circuit.

No. 96-20295.

FEDERAL DEPOSIT INSURANCE CORPORATION, Appellant/Cross-Appellee/
Plaintiff/Counter-Defendant,

v.

FIREMEN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY, Appellee/Cross-
Appellant/Defendant/Counter-Claimant.

April 10, 1997.

Appeals from the United States District Court for the Southern District of Texas.

Before KING and PARKER, Circuit Judges, and ROSENTHAL,[*] District Judge.

PER CURIAM:

The Federal Deposit Insurance Company ("FDIC") appeals the district court's order granting

the cross-motion for summary judgment of Firemen's Insurance Company ("Firemen's") in a

declaratory judgment action to determine coverage under a savings and loan blanket bond for losses

claimed by the FDIC as a successor-in-interest to United Savings Association of Texas ("USAT").

Firemen's cross-appeals the district court's earlier order denying partial summary judgment on the

issue of whether the FDIC provided proper notice of loss.  Finding no error, we affirm.

I. Background

*A. The Couch Transactions*

The story underlying this bond coverage dispute begins in 1966.  In that year, USAT began

entering into certain real estate transactions, known as "swaps," with O. Dean Couch, Jr., and two

entities related to Mr. Couch, Security General Investment Company and Associated Properties, Inc.

(Mr. Couch and the entities will be collectively referred to as "Couch".).  The swaps entailed USAT's

cash purchase of pools of mortgage loans from Couch.  The swaps relevant to this case took place

between August 5, 1985, and April 1, 1986, and had an aggregate value of over $40 million.  In each

pertinent transaction, USAT presented Couch with a check at closing pursuant to the relevant Sales

---

[*] District Judge of the Southern District of Texas, sitting by designation.

Agreement and Sales Certificate.

Under these Sales Agreements, Couch represented that he was selling "certain first mortgage loans on real estate." Additionally, Couch personally guaranteed each loan and agreed to buy back or provide a substitute of equal value for any defaulting loan. USAT retained Couch to service the purchased loans. Couch held the original loan files and policies and was to make periodic guaranteed payments to USAT, regardless of whether the mortgagors made their payments on time to Couch.

Couch ceased to make the required payments to USAT in April 1986. In September 1986, USAT discovered that Couch had defrauded it regarding the nature of the mortgages sold in the swaps. The majority of the mortgages were subject to conflicting liens created by Couch and were secured by subordinate liens, rather than first liens as provided for in the Sales Agreements. USAT was left with over $17 million in loans that were secured by second or later-in-time mortgages.

Couch unsuccessfully filed for Chapter 11 bankruptcy in October 1996. His discharge was denied for failure to satisfactorily explain his loss of assets. Couch was convicted of sixteen counts of criminal fraud in April 1992. His conviction was upheld on appeal.

*B. The Bond and Rider*

Prior to May 1, 1984, USAT purchased a $15 million Standard Form Number 22 Savings and Loan Blanket Bond (the "Bond") from Firemen's for coverage from May 1, 1984, until at least January 15, 1987. The general purpose of such a bond is to protect a financial institution from employee dishonesty or other human failings. USAT also purchased a fraudulent mortgages rider to the Bond, Standard Rider Number 5609e (the "Rider"). The general purpose of the Rider is to indemnify a financial institution for losses due to the receipt of real property mortgages or other like instruments that are defective by reason of fraud with respect to the signature thereon. Specifically, the Rider provided coverage up to limits of the Bond ($15 million) for:

> Loss through the Insured's having, in good faith and in the course of business in connection with any loan, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instrument pertaining to realty or assignments of such mortgages, deeds of trust or instruments which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses....

*C. The District Court Proceedings*

As a successor-in-interest to USAT, the FDIC filed a declaratory judgment action against Firemen's in federal district court in July 1994. The FDIC sought a declaration that USAT's losses stemming from Couch's fraud were covered by the Rider to the Bond. Firemen's filed a counterclaim seeking a declaratory judgment that the Rider did not cover such losses.

After stipulating to the relevant facts, the FDIC and Firemen's filed cross-motions for partial summary judgment on the issue of whether the Rider provided coverage. The district court found that the Rider did not provide coverage and entered a declaratory judgment to that effect in favor of Firemen's. Final judgment was entered on February 9, 1996. The FDIC timely filed a notice of appeal on March 8, 1996. Firemen's has cross-appealed an earlier district court ruling on a motion for partial summary judgment, in which the court found that the FDIC had provided sufficient and timely notice of the loss, thereby satisfying a condition precedent to the filing of the claim. Due to our disposition of the FDIC's appeal, we do not reach the question presented by Firemen's cross-appeal.

The FDIC raises a single issue on appeal: whether the district court erred in entering summary judgment in favor of Firemen's. The FDIC asserts that it has presented a reasonable interpretation of the Rider and, under Texas laws of insurance contract interpretation, the district court was required to accept this interpretation because the Rider's language was ambiguous. Under the FDIC's proffered interpretation, the Rider would provide coverage for losses due to Couch's fraud.

## II. Discussion

### A. Standard of Review

We review the granting of summary judgment de novo, applying the same criteria used by the district court. *See Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994). First, we consult the applicable law to ascertain the material factual issues. *See King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(c).

*B. Legal Standards for Construing Bonds*

We look to state law for rules governing contract interpretation. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.,* 88 F.3d 347, 352 (5th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 740, 136 L.Ed.2d 679 (1997). The applicable state law in this case is that of Texas.

An insurance policy is a contract and is therefore subject to rules of contract interpretation. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). Under Texas law, blanket bonds are to be construed in the same manner as insurance policies. *See Abilene Sav. Ass'n v. Westchester Fire Ins. Co.,* 461 F.2d 557, 559 (5th Cir.1972)(construing Texas law); *see also Great Am. Ins. Co. v. Langdeau,* 379 S.W.2d 62, 65 (Tex.1964)(finding that fidelity bonds should be construed under the "liberal rules applicable to insurance contracts").

If an insurance contract contains ambiguous language, that ambiguity must be resolved in favor of the insured, if the insured presents a reasonable interpretation. *See Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 737 (Tex.1990). However, when a clause is clear and unambiguous, this rule does not apply. *See Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984). When an insurance provision is capable of only one reasonable interpretation, we need not resort to rules for interpreting ambiguous contracts. *See Upshaw v. Trinity Co.,* 842 S.W.2d 631, 633 (Tex.1992).

In interpreting an insurance policy, the court's primary concern is to give "effect to the written expression of the parties' intent." *Union Pac. Resources Co. v. Aetna Cas. & Sur. Co.,* 894 S.W.2d 401, 405 (Tex.App.—Fort Worth 1994, writ denied). When there is no ambiguity in the language, courts must give the words used their plain, ordinary, and generally accepted meaning unless the policy shows that the words were meant in a technical or different sense. *See Canutillo I.S.D. v. National Union Fire Ins. Co.,* 99 F.3d 695, 700 (5th Cir.1996).

*C. Interpretation of the Rider*

The FDIC interprets the Rider as covering an insured's losses from a transaction related to the transfer of mortgages when any person is induced by fraud to sign any document related to the transfer. The FDIC asserts that the Rider is ambiguous and therefore the district court was required

to accept the insured's reasonable interpretation.

The FDIC presents a chain of arguments that, if correct, would establish the ambiguity of the Rider and the reasonableness of its interpretation. First, the Rider covers assignments of mortgages. The FDIC contends that swap documents, the Sales Agreements and Sales Certificates, executed by USAT and Couch and pertaining to the transfer of mortgages, are "assignments" of mortgages under the Rider. Second, the FDIC argues that under the Rider, an assignment becomes defective, and hence covered, when the signature of any person on that assignment is obtained by fraud. Under the FDIC's interpretation, because USAT's signature on the swap documents was fraudulently induced by Couch's assurances that the underlying mortgages were secured by first liens, those documents are defective under the terms of the Rider. Under this reading of the Rider's language, the swap documents are within the Rider's scope of coverage and are defective; therefore, the Rider should cover USAT's losses resulting from Couch's fraudulent swaps.

The FDIC is correct in asserting that we must accept an insured's reasonable interpretation of an ambiguous insurance contract. However, we find the Rider to be unambiguous as applied to the present facts. While the FDIC's arguments are appealing in a sense, they are logically unsound.

By its plain language, the Rider requires five elements before its coverage applies: (1) the insured must have acted in good faith and in course of business, (2) the insured must have suffered a loss, (3) the loss must have been caused by the insured's reliance on a real property mortgage or certain specified instruments relating to mortgages, (4) the mortgage or instrument must be defective, and (5) the defect must be caused by a signature on that mortgage or instrument being obtained by fraud. *See Jefferson Bank v. Progressive Casualty Ins. Co.,* Civ. A. No. 90-584, 1990 WL 180585, at \*5 (E.D.Pa. Nov.19, 1990) (interpreting the Rider as requiring elements two through five), *aff'd,* 965 F.2d 1274 (3d Cir.1992).

Setting aside any consideration of the first four elements, the fifth element is clearly lacking in this case. Contrary to the FDIC's arguments, a covered instrument does not automatically become defective under the Rider merely by containing a signature that was obtained fraudulently. The mortgages USAT obtained in the swap transactions may have been "defective," in the sense that they

were worthless or had little value to USAT. However, this "defect" was not caused by USAT's signature being obtained through fraud. USAT's signature, whether fraudulently obtained or not, had no effect on the value of the assignments or the underlying mortgages from USAT's perspective. USAT, at its own option, could have enforced its rights against Couch under the agreements or rescinded the transactions. Therefore, the fact that USAT's signature was obtained fraudulently did not *cause* any defect.

Other courts interpreting similar provisions in blanket bonds have come to the same conclusion. In *Reliance Ins. Co. v. Capital Bancshares, Inc.,* 685 F.Supp. 148 (N.D.Tex.1988), *aff'd,* 912 F.2d 756 (5th Cir.1990), the court was required to interpret Insuring Agreement (E) to the Bond. That provision provides coverage for losses caused by a bank's reliance on certain instruments, including mortgages and stock certificates, that prove to be defective for certain specified reasons, such as forged signatures thereon. In that case, the bank accepted stock certificates as collateral for a loan. The stock certificates proved to be worthless, as the debtor owned no stock in the corporation and the certificates themselves contained forged signatures of corporation officers. The court found that even though the certificates were worthless and contained forged signatures, the banks losses were not *caused* by the forged signatures. *Id.* at 151-52. For "[e]ven if the signatures had been genuine, the bogus stock certificates would not have been and the banks would still have suffered losses identical to those they now face." *Id.; see also Liberty Nat'l Bank v. Aetna Life & Cas. Co.,* 568 F.Supp. 860, 863 (D.N.J.1983) (finding that Insurance Agreement (E) did not cover losses stemming from a bank's reliance on certificates of deposit that contained forged signatures when the bank's losses were actually caused by the lack of underlying assets to support the certificates).

As the FDIC makes no argument that the mortgages' values were somehow impaired by the fact that USAT's signatures on the swap documents were obtained by fraud, we need not indulge in an esoteric analysis of causation. Suffice it to say that when an insurance policy only covers losses caused by specific events, no coverage exists if those losses are caused by an uncovered or excluded event. *See Warrilow v. Norrell,* 791 S.W.2d 515, 527-28 (Tex.App.—Corpus Christi 1989, writ

denied)(discussing distinctions of causation requirements between property insurance contracts and liability insurance contracts). If there is any ambiguity in this Rider, it does not exist in relation to the question of whether the Rider provides coverage for "defective" mortgages when the defect is caused by something other than a signature being obtained by fraud. Unequivocally, the Rider does not provide coverage for such a loss.

Firemen's urges this court to go further in interpreting the Rider. It urges that we interpret the Rider to cover only instruments that are unenforceable and then only when the instrument is unenforceable due to a signature being obtained by fraud in the factum rather than fraud in the inducement.[1] While such an interpretation would render the same result as our decision today, we decline to answer these questions categorically, as such a holding is unnecessary to resolution of this appeal. Accordingly, we express no opinion as to the differing effects of fraud in the factum and fraud in the inducement on the Rider's coverage. Additionally, we express no opinion as to whether a covered instrument must be unenforceable before the Rider's coverage will apply.

We simply hold that an instrument is only defective under the Rider if that defect *results from* a signature being obtained through trick, artifice, fraud, or false pretenses. When the fact that the signature is fraudulently obtained has no impact on the instrument's value to the insured, as in the present case, the Rider does not provide coverage.

AFFIRMED.

---

[1]Fraud in the factum is defined as "[m]isrepresentation as to the nature of a writing that a person signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms." BLACK'S LAW DICTIONARY 661 (6th ed.1990). Fraud in the inducement, which is broader, is defined as "[f]raud connected with [the] underlying transaction and not with the nature of the contract or document signed. Misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." *Id.* The parties stipulated that the fraud in question in this case was fraud in the inducement.