# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 5, 2026

Lyle W. Cayce
Clerk

No. 24-20439

IN THE MATTER OF CARBO CERAMICS, INCORPORATED, ET AL.

*Debtor*,

CARBO CERAMICS, INCORPORATED,

*Appellant*,

*versus*

BOARD OF TAX ASSESSORS FOR WILKINSON COUNTY, GEORGIA;
WILKINSON COUNTY, GEORGIA,

*Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CV-728

_____

Before JONES and GRAVES, *Circuit Judges*, and RODRIGUEZ, *District Judge*.*

PER CURIAM:**

---

* District Judge for the Southern District of Texas, sitting by designation.

** This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 24-20439

For years, business was booming for CARBO Ceramics.  In 2014, however, CARBO lost its largest client and experienced significant economic downturn.  Then, the Wilkinson County Board of Tax Assessors ("Assessors") in Wilkinson County, Georgia, stopped giving CARBO tax incentives under a bond-for-title arrangement between CARBO and the Development Authority of Wilkinson County ("Authority").  After years of disputes and even a settlement in 2017, the ad valorem tax controversy persists, boiling down to a singular point of contention: Are the Assessors required to consider obsolescence and inutility based on the economic downturn when calculating what CARBO owed for tax years 2018 to 2022?  The correct answer is yes.  Because the bankruptcy and district courts held otherwise, the judgments of the bankruptcy court and district court are REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

## I. Background

CARBO Ceramics manufactures ceramic proppants, which are solid, spherical beads that fracture oil and gas wells and "prop[] open the reservoir."  Government entities in Wilkinson County, Georgia,[1] wanted CARBO to build its manufacturing plants in the county to stimulate investments and create more jobs.  The Authority thus offered CARBO various incentives to locate facilities there.

Providing incentives in Georgia is tricky because the state constitution forbids it from "grant[ing] any donation or gratuity or to forgive any debt or obligation owing to the public."  GA. CONST. art. III, § VI, para. VI.  To

_____

[1] In addition to the Authority and the Assessors, these entities include the Board of Commissioners of Wilkinson County ("County") and the Wilkinson County Board of Education.

2

work around this provision, the Authority and CARBO entered into a "bond-for-title" arrangement.[2] The Authority issued a bond to CARBO, and in return, CARBO transferred title to its manufacturing facilities to the Authority and then leased them back from the Authority. With this stratagem, the Authority's ownership interest would be exempt from property taxes, and only CARBO's leasehold interest would be taxable. Even then, however, CARBO did not technically pay ad valorem taxes or actual taxes on its leasehold interest; it instead owed the County "Payments in Lieu of Taxes" ("PILOTs"). The PILOTs were calculated to reduce CARBO's tax burden to the County.

More specifically, to calculate the PILOTs, the plants' machinery and equipment were taxed on 40% of their assessed value, the default percentage in Georgia. GA. STAT. ANN. § 48-5-7. That result (40% of the assessed value) was multiplied by the applicable "value percentage," a number that increased from 30% in year one to 100% from year ten onward. That value-percentage multiplier represented the tax benefit to CARBO.

Relevant here, the 2008 MOU explained how to calculate the assessed-value component of that equation:

> Machinery and Equipment falls in Economic Life Group III (as defined in the applicable Department of Revenue rules and regulations), shall be operated on a continuous 24 hour per day basis and shall be valued for ad valorem tax purposes at cost less depreciation; depreciation shall be calculated based on Department of Revenue requirements.

The Department of Revenue requirements are memorialized in an Appraisal Procedures Manual ("APM"), which prescribes that economic

---

[2] This arrangement is memorialized in a 2008 Memorandum of Understanding ("2008 MOU") and a 2008 Lease Agreement ("2008 Lease").

life groups are valued by the "cost approach." The cost-approach methodology determines the current value of an asset as the product of the "original cost new" multiplied by a "composite conversion factor" that is based on the item's "life group" (i.e., how long it should last) and its age. The APM then requires appraisers to consider "further depreciation," if any, for "physical deterioration," "functional obsolescence," and "economic obsolescence."

To receive and retain tax benefits under these calculations, CARBO had to create and maintain certain employment levels at its plants. And if CARBO failed to meet a given year's job goals, it had to make a "shortfall payment."[3] In the early years of the bond-for-title and tax incentives agreements, CARBO's operations seemed successful. From 2008 to 2014, CARBO's ceramic proppants were in high demand. During that period, demand often exceeded the capacity of CARBO's plants, and the company had to turn down many customer orders.

But in 2014, one of CARBO's largest clients announced that it was moving away from ceramic proppant to a cheaper proppant. This cheaper proppant was created with frac sand at "a tenth of the cost" of a ceramic product, but it was still effective because the industry was "now producing" from formations of shale, "a very permeable rock." To make matters worse, CARBO experienced another downturn after the collapse of the oil and gas market.

Facing a devastating downturn, CARBO turned to a force majeure clause found in the 2008 MOU. Under this clause, each year's job goals

---

[3] CARBO opened its McIntyre Plant in 1997 after entering into an agreement with the Authority. CARBO then opened its Toomsboro plant after a new agreement in 2003.

were subject to reduction upon the occurrence of a "force majeure."[4]  For each year that a force majeure existed, CARBO's job goals would "be reduced by the number of jobs" that "were not filled as a result."

In 2015, CARBO alleged that this economic decline was a force majeure event that excused it from meeting its job goals under the 2008 MOU.  CARBO also alleged that the machinery and equipment at the facilities should be assessed at a lower value because of "obsolescence and inutility" caused by this drop in demand.

Instead of agreeing, however, the Assessors—the entity responsible for appraising CARBO's taxable property for Wilkinson County ad valorem taxes—stopped giving tax abatements or incentives to CARBO.  After a couple of years, CARBO appealed the Assessor's valuation for tax years 2015, 2016, and 2017, arguing that a force majeure event had taken place. Ultimately, in July 2017, the parties entered into a settlement agreement, whereby the Assessors agreed to "assess all properties related to this Settlement Agreement at their fair market values" going forward.

But the disputes continued for each tax year starting with 2018. CARBO contested tax years 2019 through 2022 and attempted to appeal in Georgia.  Despite the disputes, CARBO still paid tax at the agreed-upon 2017 amount in each of the following years.

---

[4] According to the agreement, a force majeure included "any unexpected event" preventing CARBO's satisfaction of its job goals, such as acts of God, natural disasters, wars, civil commotion, explosions, strikes, walkouts, other labor unrest, any economic conditions amounting to a recession or depression, and terrorist acts.  To qualify as a force majeure event, the event must satisfy three elements: (1) it must be beyond CARBO's "reasonable control"; (2) it must be an event that CARBO cannot overcome through "due diligence and reasonable efforts"; and (3) it must have "a material adverse effect on the employment at the" facilities.

No. 24-20439

Before CARBO appealed the Assessor's valuations of tax years 2021 and 2022, CARBO filed for Chapter 11 reorganization in the Southern District of Texas in March 2020. The Assessors and the Authority then filed a Proof of Claim in the bankruptcy court for unpaid ad valorem taxes covering tax years 2018–2020.

Around eight months later, CARBO initiated this adversary proceeding in which it (1) objected to the Assessors' claims for unpaid taxes, (2) sought a refund for its overpayments, and (3) claimed that the Assessors denied CARBO due process by refusing to forward CARBO's appeals to the Board of Equalization as Georgia law requires.

In the adversary proceeding, the parties' agreed Joint Pretrial Statement recited only three issues of fact: (1) the amounts of "functional" or "economic" obsolescence, if any; (2) the appropriate inutility penalty, if any; and (3) whether the Assessors' litigation conduct "warrant[s] an award of litigation expenses in favor of CARBO." The only issues of law were whether CARBO was entitled to attorneys' fees and whether the County had a "right to recover penalties." Based on these premises, CARBO sought a refund of $2,616,399.38, and the Assessors sought an additional tax payment of $1,723,545.89.

At the bench trial, the bankruptcy court *sua sponte* inquired whether the 2008 MOU even "allow[s] for obsolescence," and at his request, the parties filed briefing on this issue. The trial was halted.

After digesting the parties' briefing, the bankruptcy court ruled against CARBO, holding that CARBO could not take additional depreciation for economic obsolescence or inutility under the 2008 MOU. The bankruptcy court acknowledged that the 2008 MOU adopted the cost approach in the APM and thus "allow[ed] an economic obsolescence deduction" and "additional depreciation" to be taken "[u]nder some

circumstances." But the APM was inapplicable, the bankruptcy court held, because the 2008 MOU contained an express "exclusion" foreclosing any economic-obsolescence deduction—an exclusion stating that machinery and equipment "shall be operated on a continuous 24 hour per day basis." Reading this clause in the assessed-value provision, the bankruptcy court reasoned that, if it "was a covenant, it would be a covenant without consequence." As a result, it held that the "24-hour-per-day" language was a "stipulation" for assessment purposes that foreclosed CARBO's claim of economic obsolescence or inutility.

CARBO unsuccessfully moved for reconsideration. Then, the bankruptcy court applied its interpretation of the MOU and concluded that CARBO owed the County $3,395,872.59—more than the County sought— but it did not owe attorneys' fees. With pre-judgment interest, CARBO's liability tops $4,400,000.

CARBO appealed to the district court, and finding no relief there, CARBO appealed to this court.

## II. STANDARD OF REVIEW

On appeal, this court applies "the same standard of review as did the district court." *In re Mercer*, 246 F.3d 391, 402 (5th Cir. 2001) (en banc). This court thus reviews the bankruptcy court's factual findings for clear error and its legal conclusions and mixed questions of fact and law de novo. *Id.*

## III. DISCUSSION

The parties dispute whether the 2008 MOU allows CARBO to claim inutility or economic obsolescence.[5] CARBO argues that, by incorporating

---

[5] The parties separately dispute whether the 2008 MOU even applies or whether the 2017 settlement agreement modifies or supersedes it. The bankruptcy court held that the 2008 MOU applies and that the 2017 settlement agreement did not modify or

No. 24-20439

the Department of Revenue regulations and the APM's cost approach into the 2008 MOU, the MOU required the Assessors to consider obsolescence and inutility when determining the fair market value of the machinery and equipment.  The Assessors contend that the MOU's incorporation of the Department of Revenue regulations did not specifically mention the cost approach and that other provisions of the MOU expressly foreclose consideration of obsolescence.

To resolve this dispute, the court must interpret the 2008 MOU. Under Georgia law,[6] "[t]he cardinal rule of contract construction is to ascertain the intention of the parties, as set out in the language of the contract." *Overlook Gardens Props., LLC v. Orix, USA, LP*, 884 S.E.2d 433, 440 (Ga. Ct. App. 2023) (quoting *Emory Healthcare, Inc. v. van Engelen*, 870 S.E.2d 223, 226 (Ga. Ct. App. 2022)).  Contract interpretation is a question of law, and courts interpret contracts in three analytical steps. *Id.*  First, courts "decide whether the language of the contract is clear and unambiguous." *Id.* (quoting *Emory Healthcare, Inc.*, 870 S.E.2d at 226).  If it is, courts enforce the contract "according to its plain terms, and the contract *alone* is looked to for meaning."  *Id.* (emphasis added) (quoting *Emory Healthcare, Inc.*, 870 S.E.2d at 226).  Second, if the language *is* ambiguous, courts must apply "'the rules of contract construction . . . to resolve the ambiguity.'" *Id.* (quoting *Emory Healthcare, Inc.*, 870 S.E.2d at 226).  Third, "if ambiguity remains," then "the issue of what the ambiguous language

---

supersede it.  That bankruptcy court's reasoning is persuasive, and because both agreements adopt the fair-market-value standard, this court assumes without deciding that the 2008 MOU applies.

[6] The Court looks to Georgia law because the 2008 MOU states that Georgia law governs, and this court generally "look[s] to state law for rules governing contract interpretation." *FDIC v. Firemen's Ins. Co. of Newark*, 109 F.3d 1084, 1087 (5th Cir. 1997) (citation omitted).

means and what the parties intended must be resolved by a jury or the trial court at a bench trial." *Id.* (brackets omitted) (quoting *Emory Healthcare, Inc.*, 870 S.E.2d at 226–27).

Based on these principles, the 2008 MOU requires the Assessors to consider obsolescence for three reasons. First, the 2008 MOU textually incorporates the APM's cost approach. Second, the APM's cost approach requires the Assessors to consider obsolescence. And third, the 24-hour-per-day provision does not preclude the Assessors from considering obsolescence. This court addresses each in turn.

## A.

To begin, the 2008 MOU incorporates the APM generally and its cost approach specifically. Considering the APM generally, the 2008 MOU specifies the valuation method for the property at issue. That valuation method expressly references regulations from the Department of Revenue when it states that the property "falls in Economic Life Group III (*as defined in the applicable Department of Revenue rules and regulations*)" and "shall be valued . . . at cost less depreciation," with depreciation being calculated according to "*Department of Revenue requirements*."

By incorporating those regulations, the 2008 MOU incorporates the APM into its valuation method. Georgia law provides that "[t]he commissioner [of the Department of Revenue] *shall* . . . maintain an appropriate procedural manual for use by county property appraisal staff in appraising tangible real and personal property for ad valorem tax purposes." GA. CODE ANN. § 48-5-269.1(a) (emphasis added). The manual "*shall* be utilized by county property appraisal staff . . . ." GA. CODE. ANN. § 48-5-269.1(b) (emphasis added). In light of this mandate, Georgia's Department of Revenue compiled its regulations into the APM "to assist county tax officials in appraising tangible real and personal property for . . . ad valorem

tax purposes." *Barsamian v. Glynn Cnty. Bd. of Tax Assessors*, 897 S.E.2d 893, 896 (Ga. Ct. App. 2024) (citing Ga. Comp. R. & Regs., r. 560-11-10-.01(1)). The APM itself confirms that it was "developed in accordance with [Ga. Code. Ann. § 48-5-269.1] which directs the Revenue Commissioner to . . . maintain an appropriate procedure manual for use by the county property appraisal staff in appraising tangible real and personal property for ad valorem tax purposes." Ga. Comp. R. & Regs., r. 560-11-10-.01(1).

Indisputably, the Department of Revenue's regulations include the APM, and the "reasonably clear and ascertainable meaning" of the 2008 MOU's reference to the regulations is that the MOU effectively incorporates the APM by reference. Therefore, the Assessors are supposed to use the APM generally when determining the value of CARBO's property. *Bowman v. Walnut Mountain Prop. Owners Ass'n, Inc.*, 553 S.E.2d 389, 393 (Ga. Ct. App. 2001) ("As a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where the provisions to which reference is made have a reasonably clear and ascertainable meaning." (brackets omitted) (quoting *Goldman v. Vinson*, 535 S.E.2d 305, 307 (Ga. Ct. App. 2000))). The incorporated APM is part of the 2008 MOU itself. *Id.* (noting that documents incorporated by referenced "are treated as if a part of the document making the reference").

Further, the 2008 MOU specifically incorporates the cost approach found in the APM. The MOU states that the property falls into "Economic Life Group III." Although the APM supplies a variety of methodologies, it only uses economic life groups in the cost approach. Indeed, the MOU expressly stated that "depreciation shall be calculated based on Department of Revenue requirements," and the cost approach is the only methodology that discusses depreciation.

Pitted against the text of the 2008 MOU, the Assessors' contention that it does not adopt the APM is unpersuasive. It is also contrary to their repeated concessions in the bankruptcy court. For instance, in the Joint Pretrial Statement, they stipulated that "county boards of tax assessors shall require their appraisal staffs to follow the procedures set out in the Georgia Appraisal Procedures Manual . . . when assessing ad valorem tax on tangible property." The parties appended the APM to their Joint Pretrial Statement as Joint Exhibit 1. The Assessors referenced the APM in their answer to CARBO's complaint. Finally, the Assessors' memorandum of law stated that "the parties agreed, in effect, to be bound by the Basic Cost Approach set forth in Revenue Rule 50-11-10-.08 of the [APM] . . . ." The Assessors' litigation conduct relying on or citing with approval the APM undermines their arguments to the contrary.

Moreover, the Supreme Court of Georgia has signaled the APM's importance to valuation methods when it held that a valuation method is suspect if it does not "follow[] an authorized appraisal approach," even in a bond-for-title arrangement. *Sherman v. Fulton Cnty. Bd. of Assessors*, 701 S.E.2d 472, 474–76 (Ga. 2010). The court noted that any method must aim to "determine[e] the fair market value of the property." *Id.* at 475; *see also DeKalb Cnty. Bd. of Tax Assessors v. W.C. Harris & Co.*, 282 S.E.2d 880, 884 (Ga. 1981) (noting that valuation methods adopted by bond-for-title agreements are invalid if they are "arbitrary or unreasonable").

## B.

Next, because the 2008 MOU incorporates the APM's cost approach to assessed value, that methodology requires the Assessors to consider obsolescence and inutility. Generally, the APM's cost approach "allow[s] for physical deterioration, functional [obsolescence,] and economic obsolescence." A section of the APM's cost approach is titled, "Further

depreciation to basic cost approach value." That section states that appraisers "*shall* consider any evidence" of "[p]hysical deterioration," "[f]unctional obsolescence," and "[e]conomic obsolescence."

In addition, the fact that 2008 MOU adds that "depreciation shall be calculated based on Department of Revenue requirements" confirms the centrality of obsolescence in the depreciation analysis. After all, the APM defines "depreciation" as "the loss of value due to any cause," i.e., "the difference between the market value of . . . a piece of equipment and its reproduction or replacement cost," and it divides depreciation into the three categories of "physical deterioration, functional obsolescence, and economic obsolescence." GA. COMP. R. & REGS., r. 560-11-10-.02(1)(d); *see also* GA. COMP. R. & REGS. 560-11-10-.02(1)(f), (j), (t) (defining "economic obsolescence," "functional obsolescence," and "physical deterioration" as "form[s] of depreciation"). Taken together, the 2008 MOU and its incorporation of the APM show that obsolescence is not optional; it's a requirement for the Assessors.

## C.

Finally, the clause about 24-hour operations does not change the fact that CARBO may claim obsolescence under the 2008 MOU. The bankruptcy court determined that this 24-hour-per-day clause prohibited CARBO from claiming obsolescence or inutility. According to the bankruptcy court, if the 24-hour-per-day provision "was a covenant, it would be a covenant without consequence." Instead, the court characterized the clause as a "stipulation" contained within the assessed valuation provision, and as such, it foreclosed a claim of economic obsolescence or inutility otherwise required by the APM.

We disagree with the bankruptcy court's interpretation. First, despite its location within the valuation provision, the 24-hour clause does not

explain how it impacts valuation.  There is also nothing in the 24-hour provision prohibiting the consideration of economic obsolescence or inutility.

Second, even if the clause did create an express covenant, by depriving CARBO of a significant feature of the APM's cost approach, the bankruptcy court's interpretation of the 2008 MOU would exact a forfeiture of CARBO's rights.  Forfeitures generally occur when a party to contract "forfeit[s] contractual benefits" after breaching a provision or failing to satisfy a condition.  HON. JOHN K. LARKINS III, GA. CONTRACTS LAW AND LITIGATION § 9:10 (2d ed. 2025).  Contract forfeiture is disfavored in Georgia, and courts resolve any ambiguity in a contract against forfeiture.  *A.L. Williams & Assocs. v. Faircloth*, 386 S.E.2d 151, 153 (Ga. 1989).  Because forfeitures are disfavored, they cannot be implied.  *Rodriguez v. Miranda*, 507 S.E.2d 789, 792 (Ga. Ct. App. 1998) (citing *King Indus. Realty, Inc. v. Rich*, 481 S.E.2d 861, 867 (Ga. Ct. App. 1997)).

The 24-hour clause, as the bankruptcy court acknowledged, is ambiguous.  Unlike other provisions of the 2008 MOU,[7] it "comes with no such explanations of any repercussion for not actually operating on a continuous basis."  If interpreted as "a covenant, it would be a covenant without consequence."  But as a "stipulation," the court concluded, the clause prevented CARBO from arguing economic depreciation or inutility. The court's reasoning is contradicted by Georgia law.

Looking to Georgia law, the foremost caution is that forfeitures have only been allowed when a contract provided for forfeiture in "clear and unmistakable terms."  *See, e.g.*, *Russell v. KDA, Inc.*, 425 S.E.2d 406, 408 (Ga.

---

[7] For example, the MOU stated that, if CARBO failed to meet the job goals, then the Authority would require CARBO to make a "shortfall payment."  That shortfall-payment calculation may require CARBO to remit part of the tax benefits it received from preceding year under the valuation section of the MOU.

Ct. App. 1992) (contract provided for forfeiture because it was "unambiguous" and written in "clear and unmistakable terms"); *see also id.* ("all ambiguities in a contract are to be resolved against the[] existence" of forfeitures except where provided for "in unmistakable terms" (quoting *Equitable Loan, etc., Co. v. Waring*, 44 S.E. 320, 321 (Ga. 1903)). When "'there are no express words of defeasance, forfeiture, or reversion, the words employed will be construed *as words of covenant,* and not words of condition." *Fulton County v. Collum Props., Inc.*, 388 S.E.2d 916, 919 (Ga. Ct. App. 1989) (emphasis in original) (quoting *Gordon v. Whittle*, 57 S.E.2d 169, 171 (Ga. 1950)). And in those cases, "the remedy for a breach thereof . . . would be an action thereon for damages, and not a forfeiture of the estate [or usufruct] for condition broken." *Id.* (brackets in original) (quoting *Gordon*, 57 S.E.2d at 171). The bankruptcy court's admission that the 24-hour clause is ambiguous alone suffices to prevent its interpretation as a forfeiture provision.

In addition, even a "stipulation" may result in an unlawful forfeiture. *See, e.g.*, *Bailey v. Martin*, 112 S.E.2d 807, 810 (Ga. Ct. App. 1960) (pointing to *McDaniel v. Mallary Bros. Mach. Co.*, 66 S.E. 146, 147 (Ga. Ct. App. 1909), and noting that "a stipulation in a contract," "in effect, works a forfeiture of the plaintiff's rights to recover" under the contract). Thus, the attempt to describe the 24-hour clause as a stipulation fails to insulate it from working a forfeiture of CARBO's rights.

Finally, the court's purported reliance on equity was error. The court held that "even if the parties intended to create a covenant," "CARBO cannot benefit from its own breach by factoring inutility into its PILOT payment." And though this circumstance may violate "[p]rinciples of equity," Georgia law does not always excuse one party's performance because of another party's nonperformance. Rather, Georgia law makes clear that the Assessor's performance of the contract here may be excused

*only if* CARBO's failure to operate the facilities on a continuous basis caused the Assessor's failure to consider obsolescence. *See* GA. CODE ANN. § 13-4-23 ("If the nonperformance of a party to a contract is *caused* by the conduct of the opposite party, such conduct shall excuse the other party from performance." (emphasis added)). Put simply, CARBO's failure would not excuse the Assessor's failure unless causation is present. Because causation is absent, the bankruptcy court erroneously concluded that CARBO's alleged breach excused the Assessor's duty to consider obsolescence and inutility.

\* \* \*

In sum, the 2008 MOU by its terms requires the Assessors to consider obsolescence and inutility when appraising CARBO's property for the challenged tax years. The bankruptcy court's and district court's contrary interpretations were incorrect.

## IV. Conclusion

The judgments of the bankruptcy court and district court are REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

15